## Commonwealth *vs.* Raymie Tyree.

Middlesex. September 8, 2009. - January 8, 2010.

Present: Marshall, C.J., Spina, Cordy, Botsford, & Gants, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Exigent circumstances, Warrant, Affidavit, Plain view, Consent, Fruits of illegal search.

A Superior Court judge erred in denying a criminal defendant's pretrial motion to suppress evidence obtained by police during a warrantless search of a condominium unit where the defendant was residing, as well as the defendant's shoes (which were seized at the police station after his warrantless arrest), where the Commonwealth failed to introduce evidence sufficient to justify its burden of showing that exigent circumstances — such as risk of destruction of evidence, risk of flight, risk of harm to police or others, or the impracticability of obtaining a warrant — justified the initial entry and search of the unit [682-692, 696-700]; however, the motion judge properly denied the defendant's motion to suppress with respect to evidence relating to an indictment charging armed robbery, which was discovered during a subsequent search pursuant to a warrant and supporting affidavit that, apart from observations made during the initial illegal entry and search, contained information sufficient to establish probable cause to search the premises [692-693] and with respect to evidence relating to an indictment charging possession of a controlled substance, where the items seized were in plain view and within the scope and intensity of the search permitted under the terms of the valid portion of the warrant [693-695]; finally, the motion judge properly denied the motion to suppress with respect to guns and masks, evidence relating to an indictment charging armed robbery while masked, where the items were discovered during a search conducted pursuant to valid consent given by the owner of the unit [695-696]; where this court, after weighing the properly admitted and the improperly admitted evidence together, could not conclude that the failure to suppress the evidence obtained pursuant to the initial warrantless entry and search was harmless beyond a reasonable doubt, the defendant's convictions were reversed and remanded for a new trial [700-704].

Indictments found and returned in the Superior Court Department on June 12, 2003.

A pretrial motion to suppress evidence was heard by *Peter M. Lauriat,* J., and the cases were tried before *Paul A. Chernoff,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Anne E. O'Reilly* for the defendant.

*Kimberly A. Rugo*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. We granted the defendant's application for further appellate review to consider his claim that evidence obtained during a warrantless search of a condominium unit (unit) where he was residing should have been suppressed. The defendant also sought to suppress evidence taken from him (his shoes) at the police station after his warrantless arrest, as well as evidence obtained during two subsequent searches of the unit. A Superior Court judge denied the motion to suppress in its entirety, concluding that exigent circumstances had justified the initial warrantless entry and search and that a third search of the unit was undertaken with the consent of the owner. The motion judge made no specific rulings regarding a second search, but his denial of the motion rested on an implicit conclusion that the second search, which was conducted pursuant to a warrant, was permissible.[1] The defendant was convicted on one indictment charging armed robbery while masked, G. L. c. 265, § 17,[2] and one indictment charging possession of a Class B substance, G. L. c. 94C, § 34. In an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed. *Commonwealth* v. *Tyree*, 72 Mass. App. Ct. 1111 (2008).

For the reasons that follow, we conclude that, at the hearing on the defendant's motion to suppress, the Commonwealth failed to introduce evidence sufficient to satisfy its burden of showing that exigent circumstances justified the initial entry and search of the unit. Evidence obtained during that search, including the defendant's shoes seized at the police station after his arrest, should have been suppressed. We further conclude that evidence as to the armed robbery while masked conviction obtained during the second search was properly seized pursuant to a search war-

---

[1]The defendant's application for an interlocutory appeal was denied by a single justice of this court.

[2]This appeal involves the conviction of armed robbery while masked on April 8, 2003. The defendant was acquitted on a second charge of armed robbery while masked occurring on April 6, 2003.

rant and supporting affidavit, and that, as to the drug conviction, evidence of drug paraphernalia was properly admitted under the plain view doctrine. Finally, we conclude that the third search was proper because consent was given by the owner of the unit. Because we cannot conclude that the failure to suppress the evidence obtained pursuant to the initial warrantless entry and search was harmless beyond a reasonable doubt, we reverse the defendant's convictions and remand for a new trial.

1. *Facts.* We summarize the relevant facts from the motion judge's findings, which are supported by the record, supplemented as necessary with uncontested facts from the motion hearing.[3] At about 9:15 P.M. on April 8, 2003, the manager of the Sun City Variety Store in Tyngsborough was robbed by two masked men. After responding to the scene of the robbery, the police obtained a description of the two armed assailants from the store manager. He informed the police that the assailants had taken money from him and from the store, and had fled in a white "box" van.

Tyngsborough Detective Sergeant Charles C. Chronopoulos was informed by another officer at the scene, Daniel Smith, that Raymie Tyree and Wayne Hoffman fit the store manager's description of the assailants.[4] Officer Smith believed that the two lived at 103 Cardinal Lane. Based on this information, Officer Shaun Wagner was dispatched to 103 Cardinal Lane, a unit adjoining others within a townhouse condominium complex approximately two to three miles from the scene of the robbery. Officer Wagner noticed a white box van in the condominium complex's common parking lot, noted that the hood of the van was still warm to the touch despite the snowy weather, and relayed this information to

---

[3]The evidence consisted of the testimony of Tyngsborough Detective Sergeant Charles C. Chronopoulos and Sandra Markee (the owner of the condominium unit), search warrants and returns for 103 Cardinal Lane and for a 1999 Ford E350 van, the affidavit of Sergeant Chronopoulos in support of the search warrants, and a Tyngsborough police department consent to search form signed by Markee on April 11, 2003.

[4]The store manager described the assailants as "a black male, [six feet] tall with a thin build, wearing a heavy winter jacket, with a red mask and carrying a black-colored hand gun, and a white male, also [six feet] tall with a thin build and carrying a silver-colored hand gun." Officer Smith told Sergeant Chronopoulos that he had learned about Tyree and Hoffman during his investigation of an unrelated domestic matter, that he knew the men drove a white box van, and that he suspected they were "at it again using narcotics."

Sergeant Chronopoulos. Sergeant Chronopoulos and other offi-
cers then drove to the condominium complex to join Officer
Wagner.[5]

At some point, Sergeant Chronopoulos left the complex, returned
to the scene of the robbery, and brought the store manager with
him to the condominium complex. The manager told the police
that the white box van in the parking lot "looked like" the one
the robbers had used.[6] Looking through the van's window, the
manager said that a money band that was visible on the front
passenger seat looked "similar" to the bands that had been on
money taken by the assailants from the store. There is nothing in
the record to suggest that anyone inspecting the van would have
been visible from 103 Cardinal Lane.[7]

Sergeant Chronopoulos drove the manager back to the store
and then returned to the condominium complex, joining five
other officers.[8] Two, including Sergeant Chronopoulos, were in
plain clothes. The six officers then approached 103 Cardinal
Lane. Three officers went to the area behind the unit, while
Sergeant Chronopoulos and two others went to the front door. All
had their guns drawn. There is no evidence that any lights, move-
ments, or activity of any kind had been seen or heard by the
police inside 103 Cardinal Lane at any time.

Shortly after 11 P.M., approximately one hour and forty-five
minutes after the robbery, Sergeant Chronopoulos knocked on
the front door. After two to three minutes, Sandra Markee, the

[5]Sergeant Chronopoulos testified that in addition to himself there were at
least four officers present when he initially arrived at the condominium
complex. The motion judge made no specific finding on this point.

[6]Sergeant Chronopoulos testified that the store manager referred to the van
he saw in the condominium complex's parking lot as the "same type" of van
as the one that had been used by the assailants.

[7]Although the judge made no findings concerning the physical layout of the
complex, it is undisputed that the condominium complex has a large common
parking area, some spaces of which are covered, and that grass and trees
separate the units from the parking lot.

[8]The motion judge found: "After returning [the manager] to the store,
[Sergeant] Chronopoulos, along with [five other officers], went to 103 Cardinal
Lane." Sergeant Chronopoulos testified that the five officers included four of-
ficers who were initially with him at the condominium complex. The judge
made no finding, and there was no testimony, that any officers other than
Sergeant Chronopoulos left the complex at any point before the six officers
entered 103 Cardinal Lane.

owner of the unit, opened the door.[9] Sergeant Chronopoulos
identified himself as a Tyngsborough police officer and told
Markee that the police were investigating an armed robbery. At
the motion hearing, Sergeant Chronopoulos and Markee disputed
the details of the ensuing conversation. The motion judge found
that the officers told Markee they were looking for the defend-
ant and Hoffman in connection with an armed robbery, that the
officers "then entered Markee's condominium," and that Ser-
geant Chronopoulos "then directed Markee to open the sliding
glass door in the living room area" so that three officers, who
had gone around to the back of the unit, could enter.

Once all six officers were inside, Sergeant Chronopoulos and
two other officers went to the basement, with their guns drawn.
There they saw and smelled evidence of recent cocaine use.
After hearing noises behind a bulkhead door the officers forced
the door open and found the defendant, who was "wasted," "dis-
oriented," and "drooling," and "appeared to be under the influ-
ence of drugs." Sergeant Chronopoulos also noticed that the
shoes the defendant was wearing had soles similar to footprints
Sergeant Chronopoulos had seen in the snow outside the Sun
City Variety Store shortly after the robbery. The officers arrested
the defendant for unlawful possession of narcotics and seized a
"crack pipe" and what appeared to be narcotics.

After taking the defendant into custody and conducting a
"sweep" of the unit for other individuals, Sergeant Chrono-
poulos left two officers inside the unit while he went to the
Tyngsborough police station to secure search warrants for 103
Cardinal Lane and the white box van. At least one officer remained
inside with Markee overnight until Sergeant Chronopoulos returned
with other officers at 8:15 A.M. the following day, April 9, 2003,
to execute the warrants.[10] During this, the second search, the offi-
cers recovered drug paraphernalia,[11] a black winter jacket, and

---

[9]The defendant and Markee had been dating for two years and were both
residing at 103 Cardinal Lane. At the time Sergeant Chronopoulos knocked at
the door, Markee, who testified that she has a cervical spine injury, had been
sleeping and "was sick with the flu."

[10]The warrants are dated April 9, 2003, but the record does not disclose at
what time in the early hours of the morning they had issued.

[11]The police seized a box of baking soda, a bottle of ninety-one per cent
isopropyl alcohol, three marijuana smoking bowls, two homemade smoking

a black semiautomatic replica gun.[12] They also recovered a brown paper money band marked "500" from the right front passenger seat of the van.

Later that day, the police learned that the construction company for which Hoffman worked had reported a white box van as stolen. Hoffman went to the Tyngsborough police station that evening and denied stealing the van. The police did not arrest or charge Hoffman with a crime; they telephoned Markee and asked her to allow Hoffman to stay at 103 Cardinal Lane that night, "presumably in order to keep track of his whereabouts," as the motion judge found. The defendant remained in custody.

Two days later, on April 11, 2003, at about 1 P.M. Sergeant Chronopoulos obtained an arrest warrant for Hoffman. After being brought to the Tyngsborough police station, Hoffman told Sergeant Chronopoulos that guns and masks used in the robbery were in the ductwork in the basement's rafters at 103 Cardinal Lane, but "they would not be there for much longer."[13] Sergeant Chronopoulos and three other officers immediately went to 103 Cardinal Lane, taking Hoffman with them. When Markee opened the door, Sergeant Chronopoulos told her he believed there were weapons in the basement and he wanted to search for them. He presented her with a consent to search form, which she signed. Now searching the unit for the third time, the police recovered a closed duffel bag from the ceiling area of the basement, opened the bag, and found two masks and two replica handguns, one black and one silver.

*2. Procedural background.* We describe briefly the relevant proceedings in the Superior Court. The defendant moved to suppress the evidence obtained during each of the three searches, including his shoes.[14] At the evidentiary hearing on his motion and in their initial written submissions, the parties' discussion of the initial warrantless entry and search on April 8 focused

---

pipes, and a box of razors, all of which were found on a table in the basement bedroom, and one large "Ohaus weighing scale," which was found in the "cellar storage area."

[12]The replica gun played no role in the defendant's ensuing prosecution.

[13]At this point, both the defendant and Hoffman were in police custody.

[14]There was no evidence at the motion hearing as to when or where the police seized the defendant's shoes. The evidence at trial was that the defendant's shoes were seized at the police station.

exclusively on whether Markee had consented to the search.[15] After the hearing the motion judge issued an order, sua sponte, stating: "Although not raised by the parties at the motion hearing or in their Memoranda, the Court would ask both parties to brief the question of whether the entry and search by police of 103 Cardinal Lane on April 8, 2003, was justifiable on the basis of exigent circumstances and/or hot pursuit."[16] After supplemental briefing, the motion judge issued findings of fact and rulings of law, concluding that Markee had not consented to the initial entry and search on April 8, but that, because of exigent circumstances, the officers' initial entry and search was justified. The motion judge further found that Markee had freely and voluntarily consented to the third search of her unit on April 11.[17] The motion to suppress was denied in its entirety. The defendant proceeded at trial with a defense that he was not the person who had committed the robbery with Hoffman.

3. *Motion to suppress the evidence seized during the initial warrantless entry and search.* In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error. We independently review the judge's ultimate findings and conclusions of law. *Commonwealth* v. *Colon*, 449 Mass. 207, 214, cert. denied, 552 U.S. 1079 (2007).

The Commonwealth does not challenge the motion judge's conclusion that Markee did not voluntarily consent to the initial warrantless entry and search of 103 Cardinal Lane on April 8.

---

[15]Before the grand jury, Sergeant Chronopoulos had testified that, on entering the unit for the first time on April 8, he had asked Markee to sign, and she had in fact signed, a consent form. At the hearing on the motion to suppress, Sergeant Chronopoulos conceded that Markee had not signed a consent form on April 8, but testified in effect that she had given her consent for the police officers to enter and search her unit on April 8. At trial, Sergeant Chronopoulos again testified that Markee had consented to the initial entry on April 8.

[16]At the hearing on the defendant's motion to suppress, there was no mention of "hot pursuit." There was only one passing reference to "exigency" when Sergeant Chronopoulos, amending the testimony he had given before the grand jury, testified that he had in fact *not* asked Markee to sign a consent to search form before the initial search of her unit "[d]ue to the nature of the exigent circumstances of the crime and the involvement with the weapons, the dangerous — the handguns. And [Markee's] willingness, her — basically she was saying, 'I want [the defendant] out of the house.' "

[17]The motion judge made no findings or conclusions concerning the second search, which occurred after the issuance of a search warrant on April 9.

We therefore consider first whether that entry and search was justified by exigent circumstances. See *Commonwealth* v. *DeJesus*, 439 Mass. 616, 619 (2003). On a careful review of the record we conclude that the Commonwealth did not introduce evidence sufficient to sustain its burden of showing that a search warrant was not required because of exigent circumstances.[18]

The legal principles that govern the resolution of this case are well established. Warrantless searches of a residence presumptively violate the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution. See *Commonwealth* v. *Vuthy Seng*, 436 Mass. 537, 549-550, cert. denied, 537 U.S. 942 (2002). The presumption against warrantless searches reflects the importance of the warrant requirement to our democratic society. A warrant ensures that any governmental intrusion into a dwelling "is justified by a careful prior determination of probable cause and necessity" by a neutral arbiter, a judge or magistrate, not by police officers who will themselves carry out the search. K.B. Smith, Criminal Practice and Procedure § 4.18 (3d ed. 2007). See *Commonwealth* v. *Marquez*, 434 Mass. 370, 374 (2001), quoting *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975) ("The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amend-

---

[18]The defendant argues that the motion judge could not properly conclude that exigent circumstances were present in this case because at the hearing on the motion to suppress the Commonwealth proceeded solely on the basis of consent, and there was "no testimony regarding exigent circumstances at the motion hearing, nor was there testimony regarding whether it would have been impracticable for officers to obtain a warrant." To the extent that the defendant challenges the judge's request for supplemental briefing on exigent circumstances, we reject the claim. See Mass. R. Crim. P. 11 (b) (2) (iv), as appearing in 442 Mass. 1509 (2004) (motion judge may make pretrial orders that "promote the fair, speedy and orderly disposition of the case"). The motion judge was permitted to decide the motion to suppress on any ground supported by the evidence. Cf. *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997) (appellate court may affirm motion judge's holding on alternate legal theory supported by evidence). Stated differently, whether exigent circumstances justified a warrantless entry and search depended on facts found by the judge and supported by the evidence at the hearing, not on the theory advanced by the prosecution at the hearing. Here, the judge did not invite the Commonwealth to introduce additional evidence; he simply asked the parties to brief a separate issue.

ment [and art. 14 were] designed to circumscribe by the general requirement of a *judicial determination* of probable cause" [emphasis added]).

Given the high value that our Federal and Massachusetts Constitutions assign to the warrant requirement, particularly in relation to a dwelling, we impose a heavy burden on the Commonwealth to justify every warrantless search: in the absence of consent, the Commonwealth must prove both probable cause to enter the dwelling[19] and the existence of exigent circumstances. See *Commonwealth* v. *DeJesus, supra* (for nonconsensual entry to be valid, there "must be probable cause and there must be exigent circumstances"). Under the exception for exigent circumstances, "there must be a showing that it was impracticable for the police to obtain a warrant, and the standards as to exigency are strict." *Commonwealth* v. *Forde, supra* at 800, and cases cited. See *Commonwealth* v. *Washington*, 449 Mass. 476, 486 (2007), quoting *Commonwealth* v. *Cast*, 407 Mass. 891, 904 (1990) (Commonwealth "must show . . . 'that it was impracticable for [officers] *to get a warrant*' " [emphasis in original]).

Notwithstanding these foundational requirements, the Commonwealth asks us to hold that exigent circumstances *always* justify a warrantless entry and search in the aftermath of a crime involving a firearm where the police have reason to believe (i.e., probable cause) that an armed suspect is in a particular place, even in circumstances where it is not impracticable to obtain a warrant. None of the cases on which the Commonwealth relies, nor any decided since *Commonwealth* v. *Forde, supra*, supports so broad a proposition.[20,21]

The Commonwealth is correct that some of the circumstances

---

[19]The motion judge made no finding regarding probable cause. In his application for further appellate review and in his brief to this court, the defendant does not argue that the police lacked probable cause to enter 103 Cardinal Lane on April 8, 2003, although at oral argument defense counsel stated that the defendant expressly declined to concede the point. That aspect of his challenge to the warrantless entry and search is waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[20]The Commonwealth's argument is in essence a request that we return to the "traditional" common-law rule in Massachusetts: "An officer who has the right to arrest without a warrant because he suspects on reasonable grounds that the defendant has committed a felony, has a right to break open doors." *Commonwealth* v. *Phelps*, 209 Mass. 396, 407-408 (1911). In *Commonwealth*

to which courts have looked to determine whether exigent circumstances exist were present in this case. See *Commonwealth* v. *Forde, supra* at 801, 807 (stating that whether exigent circumstances exist depends on consideration of "the circumstances in their totality" and suggesting circumstances that "have tended to support a finding of exigency"). There was "a showing that the crime was one of violence or that the suspect was armed." *Id* at 807. There was a "clear demonstration of probable cause." *Id*. And there was "strong reason to believe that the suspect was in the dwelling." *Id*. However, evidence of additional circumstances, one or more of which invariably is present in our cases supporting a conclusion of exigency, was wholly absent in this record. We focus on four such circumstances relied on by the motion judge for which there was no record evidence.

(a) *Risk of destruction of evidence*. The Commonwealth argues, and the motion judge summarily agreed, that there was a risk that evidence at 103 Cardinal Lane, specifically money and physical evidence such as clothing and guns, would be lost or destroyed absent immediate police action. The record does not suggest any such threat, for at least two reasons. See *Commonwealth* v. *DeJesus*, 439 Mass. 616, 621 (2003) (warrantless entry impermissible "in the absence of specific information supporting an objectively reasonable belief that evidence will indeed be removed or destroyed unless preventative measures are taken"); *Commonwealth* v. *Huffman*, 385 Mass. 122, 126 (1982) (same).

First, the circumstances in this case were insufficient to support an objectively reasonable belief that the stolen money imminently would change hands. The Commonwealth argues that

v. *Forde*, 367 Mass. 798, 804-806 (1975), this court explicitly departed from the common law, concluding that "a warrantless entry into a dwelling to arrest in the absence of sufficient justification for the failure to obtain a warrant" is impermissible. See *Payton* v. *New York*, 445 U.S. 573, 576 (1980) (Federal Constitution "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest" absent exigent circumstances).

[21]The Commonwealth relies on *Welsh* v. *Wisconsin*, 466 U.S. 740, 750 (1984). But there the United States Supreme Court noted only that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Id.* at 753. The Court did not suggest that the use of a firearm in the underlying offense should be the only or even the predominant relevant factor. See *id*.

stolen "cash is likely to be disposed of quickly," and we have noted "the fungible nature of money in general, and the tendency of illicit money to change hands quickly." *Commonwealth* v. *Washington*, 449 Mass. 476, 485 (2007). But in each case in which money was the focus of the warrantless search, the conduct underlying the search involved ongoing illegal drug activities where further drug sales or purchases were possible. See *id.* at 478 (exigent circumstances where suspects were driving away from drug deal and could have disposed of cash had police not acted immediately); *Commonwealth* v. *Lopez*, 38 Mass. App. Ct. 748, 750 (1995) (exigent circumstances where surveillance outside apartment building after controlled drug buy could not prevent money from being transferred between apartments inside); *Commonwealth* v. *Lee*, 32 Mass. App. Ct. 85, 87-89 (1992) (exigent circumstances where drug sale occurred in defendant's supermarket and surveillance without entry could not prevent money from changing hands quickly inside and evading detection). Here, the record reveals that the police had no reason to suspect that any illicit drug distribution was occurring at the unit,[22] and the suspects had no way to slip the stolen cash out of the unit while the police maintained their surveillance at the front and rear of the premises. See *Commonwealth* v. *Washington, supra* at 478; *Commonwealth* v. *Lopez, supra*; *Commonwealth* v. *Lee, supra*.

Second, the Commonwealth maintains, and the judge found, that any delay risked the destruction of the suspects' clothing and masks. However, the record reveals no reasonably objective basis to believe that the guns and clothing used in the robbery were "susceptible to destruction or removal" from the unit. *Commonwealth* v. *Cataldo*, 69 Mass. App. Ct. 465, 474 (2007). The police had a presence at the front and the rear of the unit prior to the warrantless entry, no evidence suggests that the occupants were aware of the police presence during that time, and no evidence suggests that they had any incentive to remove or destroy evidence, or that they might be in the process of doing

---

[22]The police suspected that both the defendant and Hoffman were drug users, but not that they were distributors of illegal drugs. Moreover, before the warrantless entry of 103 Cardinal Lane on April 8, there was no evidence suggesting that drugs were at issue in the robbery, that drugs were being used that evening in the unit, or that any drugs were in jeopardy of destruction. See *Commonwealth* v. *Huffman*, 385 Mass. 122, 126 (1982).

so. See *Commonwealth* v. *DeJesus*, *supra* at 620 n.3; *Commonwealth* v. *Molina*, 439 Mass. 206, 210 (2003); *Commonwealth* v. *Huffman*, *supra* at 125-127. See also Part 3 (b), *infra*.

(b) *Risk of a suspect's flight.* Risk of a suspect's escape is another circumstance that may support a finding of the requisite "exigency" for a warrantless search. See *Commonwealth* v. *Forde*, 367 Mass. 798, 807 (1975) ("a likelihood that the suspect would escape if not apprehended" is one relevant circumstance in evaluation of exigency). The Commonwealth does not argue that any information available to the police before they entered 103 Cardinal Lane supports the motion judge's statement that any delay to obtain a warrant "would have also risked the possibility of the assailants fleeing," and correctly so, for there is no such evidence.[23] To the contrary, the assailants were masked and had no reason to believe the store manager might recognize them. (He did not.) Cf. *Commonwealth* v. *Duarte*, 56 Mass. App. Ct. 714, 720 (2002) (that victim and assailant knew one another increased likelihood that assailant "would flee to avoid apprehension or, at a minimum, take prompt action to conceal" or otherwise dispose of evidence). Nor did they have reason to believe police were likely to locate them in the immediate aftermath of the robbery: there was no evidence that the assailants were followed as they left the store, and the police were led to 103 Cardinal Lane only by information an officer had obtained during the investigation of a wholly unrelated domestic incident.[24,25] The police had made no contact with any individual

---

[23]The Commonwealth argues that we may infer that the suspects knew the police might be pursuing them, because the police found the defendant hiding in the basement and Hoffman absent from the unit. This inference — not argued below — is based on facts that came to light only after the police made their warrantless entry and cannot be relied on to conclude that exigent circumstances existed at the time of the entry.

[24]The crime did not occur in the daytime, the suspects were not chased by the police, and there were no witnesses who might have recognized them or followed them as they drove away. Contrast *Commonwealth* v. *Colon*, 449 Mass. 207, 209-210, 217, cert. denied, 552 U.S. 1079 (2007) (exigent circumstances where witness saw suspect shoot victim in public park and then run into nearby apartment); *Commonwealth* v. *Saunders*, 50 Mass. App. Ct. 865, 875 (2001), *S.C.*, 435 Mass. 691 (2002) (exigent circumstances where suspect had fled from police earlier, giving reason to believe he knew police were looking for him).

[25]Citing a study showing that nearly fifty per cent of all arrests are made

who was likely to have warned the suspects that the police were searching for them. See *Commonwealth* v. *Lee, supra* at 90 (exigent circumstances where suspect's son and others had just been arrested and would likely be able to contact suspect soon).

In addition, the presence of officers at both the front and rear of the unit made escape unlikely, and there was no evidence suggesting that anyone inside 103 Cardinal Lane was aware of, or likely to be aware of, the police presence outside the unit before Sergeant Chronopoulos knocked on the front door. See *Commonwealth* v. *Huffman, supra* at 125 n.6 ("Exigent circumstances may arise if a defendant becomes aware, or is certain to become aware, of an officer's presence").[26] When Sergeant Chronopoulos knocked on the front door, Markee opened the door and gave the police no reason to believe that the possible suspects had been apprised of the police presence, nor did the police see or hear signs of other occupants. See *Commonwealth* v. *Colon*, 449 Mass. 207, 217, cert. denied, 552 U.S. 1079 (2007) (exigent circumstances where there was no response after police knocked, but officers heard noises inside); *Commonwealth* v. *Moran*, 370 Mass. 10, 12 (1976) (same).[27]

---

within two hours of the commission of the crime, see 3 W.R. LaFave, Search and Seizure § 6.1(b), at 277 (4th ed. 2004), the Commonwealth asserts that many perpetrators of violent crimes expect the crimes to be reported immediately and that police will soon be in pursuit of them. Notwithstanding what the hypothesized typical criminal suspect may or may not know, we will not abandon our settled jurisprudence that the Commonwealth must introduce specific evidence concerning the defendant to meet its strict burden of showing exigency. *Commonwealth* v. *Forde*, 367 Mass. 798, 800 (1975). See *Commonwealth* v. *Huffman, supra* at 127 ("We cannot speculate or go outside the record to justify the warrantless entry into a private residence").

[26]There is no evidence that police (or the store manager) would have been visible from inside the unit while they examined the van in the common parking lot. See note 7, *supra*; *Commonwealth* v. *Pietrass*, 392 Mass. 892, 900 (1984) (no exigent circumstances where residence was "dark and quiet"); *Commonwealth* v. *Huffman, supra* at 123, 125 (no exigency where no evidence officers would have been visible when looking into defendant's apartment window from building across street). Cf. *Commonwealth* v. *Moran*, 370 Mass. 10, 11-12 (1976) (exigent circumstances where officers saw someone in dark apartment looking out windows).

[27]Even if the police could reasonably assume that the suspects had been warned of the police presence by the knock on the door and the conversation with Markee, it is implicit in the test for exigent circumstances "that police officers cannot deliberately create the exigency that leads to the warrantless arrest." *Commonwealth* v. *Molina*, 439 Mass. 206, 210 (2003). See 3 W.R.

In short, on the record before us, the police had no reason to believe that the suspects were likely to flee the residence in the time it would have taken to procure a warrant to search the premises.

(c) *Risk of harm to police or others.* In *Commonwealth* v. *Moran, supra,* this court held that exigent circumstances existed where the police had reason to believe that seeking a warrant would jeopardize the safety of police or others. See *Commonwealth* v. *Moore,* 54 Mass. App. Ct. 334, 340 (2002); *Commonwealth* v. *Saunders,* 50 Mass. App. Ct. 865, 875 (2001), *S.C.,* 435 Mass. 691 (2002); *Commonwealth* v. *Donoghue,* 23 Mass. App. Ct. 103, 108-109 (1986), cert. denied, 481 U.S. 1022 (1987). Although the motion judge stated that any delay in entering 103 Cardinal Lane to obtain a warrant "risked . . . harming the officers and anyone else inside 103 Cardinal Lane," the record is devoid of any evidence to support that conclusion, and the judge cited none.[28],[29]

The Commonwealth argues that "[i]nherent" in the aftermath of any violent crime or crime involving a firearm is "an objectively reasonable belief" that there is a "likelihood" that others will be harmed if police maintain physical surveillance of the premises while seeking a warrant. Were we to agree, no warrant would be required in any case where the police search for suspects in the aftermath of a violent crime. None of our cases supports

LaFave, Search and Seizure § 6.5(b), at 402-403 & nn.57, 58 (4th ed. 2004) (citing cases where claims of exigent circumstances have been rejected by courts in other jurisdictions after the police "unnecessarily warned those within" a dwelling by "seeking to question those within" or "by asking for their consent to search the premises").

[28]The Commonwealth is not assisted by its reliance on *Commonwealth* v. *Bass,* 24 Mass. App. Ct. 972 (1987). There, the Appeals Court stated that the "likelihood that [the suspect] was armed *and* on the run constituted exigent circumstances which gave constitutional justification for search of a residence without a warrant" (emphasis added). *Id.* at 973. There was no evidence in this case that the suspects were "on the run."

[29]The Commonwealth maintains that only by entering the unit could the police determine whether their efforts at locating the possible suspects and securing weapons should have been directed elsewhere. The Commonwealth could have, but did not, introduce evidence that any possible delay caused by obtaining a warrant would have detracted from investigative work by other Tyngsborough police officers. "We cannot speculate or go outside of the record to justify the warrantless entry into a private residence." *Commonwealth* v. *Huffman,* 385 Mass. 122, 127 (1982).

such a ruling. Here, no evidence suggests that the police were in any danger prior to their entry or that they believed Markee, whom they knew to be the occupant of the unit, was in danger. The entry occurred in the middle of the night, and there is no evidence that any other persons were in the vicinity, or likely would be. See *Commonwealth* v. *Moore, supra* at 338 (exigent circumstances where officers immediately responded to reports of shots being fired from apartment window); *Commonwealth* v. *Saunders, supra* (exigent circumstances where armed suspect fled from police into densely populated apartment complex at time when children were about to begin leaving for school). The police had no reason to believe that immediate action was necessary to locate any victims. See *Commonwealth* v. *McDermott,* 448 Mass. 750, 766-767, cert. denied, 552 U.S. 910 (2007) (exigent circumstances where officers feared more victims may be in suspect's residence after suspect killed seven coworkers in shooting rampage); *Commonwealth* v. *Young,* 382 Mass. 448, 457-458 (1981) (exigent circumstances where trail of blood from murdered body led police directly to apartment); *Commonwealth* v. *Donoghue, supra* at 108 (exigent circumstances where "unusually brutal" nature of assault that had just occurred suggested suspect was dangerous and there may be other victims). Nor was there any evidence to suggest that the suspects were likely to engage in violence to avoid capture while the police sought a warrant.

(d) *Impracticability of obtaining a warrant.* In evaluating whether exigent circumstances existed, we also have placed particular emphasis on whether police "consider[ed] how long it would take to obtain a warrant" before acting, *Commonwealth* v. *Pietrass,* 392 Mass. 892, 899 (1984), and whether police engaged in an unjustified delay before seeking a warrant. Here the record is devoid of evidence that obtaining a warrant before the police entered the unit was impracticable. See *Commonwealth* v. *Huffman,* 385 Mass. 122, 125 (1982) (no exigent circumstances where "Commonwealth did not offer any evidence as to the time it would take to get a warrant, or indicate that it would be impractical to get one").[30] Cf. *Warden, Md. Penitentiary* v. *Hayden,* 387 U.S. 294, 298-299 (1967) (exigent circumstances where police converged on suspect's house within minutes of armed

---

[30]The Commonwealth argues that the police did not have probable cause sufficient to secure a search warrant before the store manager identified the

robbery and speed "was essential" to protect officers and prevent escape). There is no evidence that the police had reason to believe that a warrant would be unobtainable had they sought one before entering the unit. Contrast *Commonwealth* v. *Boswell*, 374 Mass. 263, 270-271 (1978) (exigent circumstances where probable cause was "in doubt" before police knocked on door and recognized person who answered as suspect).

(e) *Conclusion*. For purposes of reviewing whether a warrant-less search falls within the narrow exception of exigent circumstances, we evaluate "the scene as it could appear to the officers at the time, not as it may seem to a scholar after the event with the benefit of leisured retrospective analysis." *Commonwealth* v. *DeJesus*, 439 Mass. 616, 620 n.3 (2003), quoting *Commonwealth* v. *Young*, *supra* at 456. In this case, neither the police nor the Commonwealth defended the warrantless entry and search on the basis of exigent circumstances until after the motion judge invited them to do so. See notes 15 and 16, *supra*. We are reticent to apply a "leisured retrospective analysis," *Commonwealth* v. *Young*, *supra*, and to disregard the perceptions of officers at the scene who had not suggested that an exigency existed. See *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 727 (1995) (finding of exigency "cannot rest on an after-the-fact discovery of a justification that never occurred to, nor was mentioned by, the police but is subsequently imputed to them in an effort to salvage a well-intentioned but flawed prosecution"). No facts in evidence support a conclusion of exigent circumstances.[31] Evidence

van and money band on its seat. Even if correct, the police delayed an immediate entry while Sergeant Chronopoulos drove the manager back to the store. There is no reason why they could not have obtained a warrant at that time: the Commonwealth presented no evidence to explain why another officer could not have sought a warrant while Sergeant Chronopoulos drove the manager back to the store. Although the Commonwealth argues the court may infer that the other officers waited for Sergeant Chronopoulos to return before approaching the unit because they determined they needed six officers to make the entry safely, the Commonwealth introduced no evidence to support such an inference; it is a post hoc explanation. See notes 25 and 29, *supra*.

[31]Although vigorously challenged by the defendant, the Commonwealth claims, and the motion judge agreed, that the entry was peaceable. See *Commonwealth* v. *Forde*, 367 Mass. 798, 807 (1975) (describing this as "[a]dditional consideration[] testing the reasonableness of police conduct . . ."). We need not resolve the point because, as discussed earlier, additional, critical circumstances were lacking.

discovered and seized during the initial entry and search on April 8 should have been suppressed.[32]

4. *Search pursuant to a warrant on April 9.* The warrantless entry into and search of 103 Cardinal Lane on April 8 were invalid. Accordingly, we must now consider whether that initial illegality impermissibly tainted the evidence seized by the police during the second search of the unit on the following day, after the police had secured a search warrant. Here too the law is settled, and in applying it to the facts in this case — in particular the affidavit of Sergeant Chronopoulos signed in support of the warrant — we conclude that the evidence seized during the April 9 search was admissible.

Evidence obtained during a search pursuant to a warrant that was issued after an earlier illegal entry and search is admissible as long as the affidavit in support of the application for a search warrant contains information sufficient to establish probable cause to search the premises "apart from" observations made during the initial illegal entry and search. *Commonwealth* v. *DeJesus*, 439 Mass. 616, 625 (2003). In such circumstances, the search pursuant to a valid warrant provides an independent source for the challenged evidence "untainted by information discovered during the initial [illegal] entry." *Id.* at 627. See *Commonwealth* v. *Blake*, 413 Mass. 823, 830 (1992), quoting *Segura* v. *United States*, 468 U.S. 796, 813-814 (1984) ("Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence [if there is] an independent source for the warrant under which the evidence was seized").

After excluding all information obtained from the impermis-

---

[32]The evidence included the "crack pipe" and narcotics found in the basement area of 103 Cardinal Lane, and testimony regarding the defendant's location and appearance at the time of his arrest. See *Commonwealth* v. *Marquez*, 434 Mass. 370, 377 (2001), quoting *New York* v. *Harris*, 495 U.S. 14, 20 (1990) ("purpose of the warrant requirement for an arrest in the home is 'to protect the home, and *anything incriminating* the police gather[] from arresting [a defendant] in his home' " [emphasis added]); *New York* v. *Harris*, *supra* (unjustified "warrantless entry will lead to the suppression of *any* evidence found . . .* inside the home" [emphasis added]); *Commonwealth* v. *DiGeronimo*, 38 Mass. App. Ct. 714, 730 (1995) (officer's observations of defendant's intoxicated state when officer found defendant in course of unlawful warrantless entry must be suppressed). We address later the admissibility of the defendant's shoes, which were seized at the police station.

sible warrantless entry and search, we conclude that the remaining portions of Sergeant Chronopoulos's affidavit in support of the search warrant contained more than adequate information to support a finding of probable cause to search 103 Cardinal Lane and the white box van for evidence related to the armed robbery.[33] The untainted information in the affidavit included the store manager's description of the two assailants and the white box van; Officer Smith's knowledge that Hoffman and the defendant fit the description of the assailants, were known to be driving a white box van, and were living at 103 Cardinal Lane; the discovery of the white box van parked in the condominium complex's parking lot with its hood warm to the touch; and the store manager's identification of the white box van and the money band visible through the van's window. Because the untainted information in the Chronopoulos affidavit established probable cause to believe evidence related to the armed robbery would be found at 103 Cardinal Lane and inside the van, justifying the issuance of the search warrants, the black jacket found in the unit and the paper money band found in the van as the result of the April 9 search were properly admitted.

The seizure of the drug paraphernalia — the scale, razors, baking soda, and other drug-related items, see note 11, *supra* — during the April 9 search raises a different inquiry. The portions of the search warrant explicitly authorizing their seizure were based on the paragraphs of the Chronopoulos affidavit that described items he had seen in the condominium unit during the illegal search on April 8. Excluding these observations, the Chronopoulos affidavit contains insufficient information to establish probable cause to search 103 Cardinal Lane for evidence of drug use or distribution. Accordingly, those portions of the search warrant permitting officers to search for such evidence were invalid. See *United States* v. *Harris*, 403 U.S. 573, 577

---

[33]The affidavit is four pages long and single spaced, and comprises fifteen paragraphs. After two preliminary paragraphs not relevant here, Sergeant Chronopoulos describes in paragraphs three through ten details of the events immediately preceding the warrantless entry. At that point the police had probable cause to arrest the defendant and obtain a search warrant, even if they did not do so. In paragraph eleven, Sergeant Chronopoulos details the conversation he had with Markee when she opened the door. Information obtained from the warrantless entry and search appears in paragraphs twelve and thirteen of the affidavit.

(1971) ("showing of probable cause" is "necessary to support a search warrant"); *Commonwealth* v. *Lett*, 393 Mass. 141, 142 (1984) ("tainted portion of a search warrant is severable from the valid portion").

Our conclusion that the drug-related evidence was seized pursuant to tainted portions of the search warrant, however, does not end the matter. As we now explain, the items of drug paraphernalia were properly admissible under the plain view doctrine, which became operative when the valid search was conducted on April 9.

Items seized pursuant to invalid portions of a warrant need not be suppressed if they were discovered in plain view during a search authorized by the valid portions of the warrant. *Commonwealth* v. *Lett, supra* at 147. Under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Commonwealth* v. *Hinds*, 437 Mass. 54, 61 (2002), cert. denied, 537 U.S. 1205 (2003), quoting *Commonwealth* v. *D'Amour*, 428 Mass. 725, 730-731 (1999). "In the case of contraband and fruits and instrumentalities of crime, the nexus to criminal activity is obvious." *Commonwealth* v. *Balicki*, 436 Mass. 1, 8 (2002), quoting *Commonwealth* v. *D'Amour, supra* at 731. It was immediately apparent to the police that the drug paraphernalia discovered during the valid search on April 9 were instrumentalities of crime.[34]

Under art. 14, the plain view doctrine applies only if the police come across the item inadvertently. *Commonwealth* v. *Balicki, supra* at 8-9. We have concluded, however, that the inadvertence requirement is "particularly ill-suited when applied to items listed in the invalid portion of a severed warrant, for it [is] at odds with the more . . . basic requirement that search warrants describe things to be seized with particularity."

---

[34]The box of baking soda, bottle of ninety-one per cent isopropyl alcohol, three marijuana smoking bowls, two homemade smoking pipes, and box of razors were all found together on a table in the basement. Together, these items were self-evidently instrumentalities of drug-related criminal activity. Given the paraphernalia laid out on the table, it was immediately apparent to the officers that the "Ohaus weighing scale" discovered nearby in the basement "storage area" was also an instrumentality of crime.

*Commonwealth* v. *Lett, supra,* quoting *United States* v. *Freeman,* 685 F.2d 942, 954 n.7 (5th Cir. 1982). Where, as here, police seize items listed in the invalid portion of a partially valid warrant, the proper inquiry "is not whether the discovery was inadvertent but whether the items seized in plain view were seized within the scope and intensity of the search permitted under the terms of the valid portions of the warrant." *Commonwealth* v. *Lett, supra.* See *Commonwealth* v. *D'Amour, supra* at 730.

The search the police conducted on April 9 was appropriate in scope and intensity to the valid portions of the warrant. The items of drug paraphernalia were all discovered on a table in the basement bedroom or in the "cellar storage area," areas where the guns and masks the officers were seeking could have been hidden. The drug paraphernalia seized in plain view during the April 9 search pursuant to the valid portions of the search warrant were properly admitted in evidence at trial.

5. *Search pursuant to consent of owner.* We turn now to the third and final search, and affirm the motion judge's finding that the search was justified by Markee's consent. Police may search a house without a warrant if a person with "common authority" over the premises consents, freely and voluntarily, to the search. *United States* v. *Matlock,* 415 U.S. 164, 171 (1974). In such cases, the Commonwealth "must show 'consent unfettered by coercion, express or implied.' " *Commonwealth* v. *Sanna,* 424 Mass. 92, 97 (1997), quoting *Commonwealth* v. *Voisine,* 414 Mass. 772, 783 (1993). The Commonwealth must also establish "something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Sanna, supra,* quoting *Commonwealth* v. *Voisine, supra.* "The voluntariness of an individual's consent to a warrantless entry is an issue of fact, and must be examined in the circumstances of the case. . . . When reviewing the denial of a motion to suppress evidence, we accept the motion judge's subsidiary findings of fact absent clear error." (Citations omitted.) *Commonwealth* v. *Sanna, supra.* Here the motion judge's finding that Markee voluntarily consented to the officers' search of her home on April 11 is fully supported by the record.

Markee signed a consent to search form before the officers

entered her home on April 11 to conduct the search.[35] Markee testified that she did not read the form, nor was it read to her by any of the officers, but she signed the form because she "was told" her house would be "wrecked" if she did not do so. There was no evidence that Markee could not read, and the judge clearly discredited her testimony on this point, as he was free to do.

The defendant argues that Markee's consent was not freely given because it was obtained through the "exploitation" of a prior illegality, specifically the warrantless entry and search on April 8, three nights earlier. We disagree. Police may rely on consent to conduct a search despite a previous invalid entry or search, so long as the "consent was an act of free will, unaffected by the taint of the [prior] illegality." *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 (1982), citing *Brown* v. *Illinois*, 422 U.S. 590, 603-604 (1975). Three days had passed since the initial invalid entry before Markee gave her consent for the search on April 11, during which time she had agreed, at the request of the police, that Hoffman could stay with her, and the police had searched the unit a second time pursuant to a partially valid search warrant. See Part 4, *supra*. Based on all the evidence, we conclude that the effects of the illegality of the initial search had sufficiently dissipated and did not taint Markee's later consent. Contrast *Commonwealth* v. *Loughlin*, *supra* at 64 (consent tainted when suspect was not advised of his right to refuse consent, "[n]o significant time elapsed between the illegality and the 'consent,' " and no "intervening event occurred that dissipated the effect of the illegality"). Finally, as the evidence shows, Markee's "words and actions placed no limitations on the scope of the entry to which [s]he was consenting." *Commonwealth* v. *Sanna*, *supra* at 99. The guns and masks discovered in the course of the search on April 11 were properly admitted.

6. *Motion to suppress defendant's shoes seized at the police station.* Our conclusions regarding the validity of the three searches do not end our analysis. The Commonwealth, citing *Commonwealth* v. *Street*, 56 Mass. App. Ct. 301, 307-309 (2002), argues that the defendant's shoes, which were seized at the

[35]The form stated that the consent to search "has been given by me, voluntarily and without any threats or promises of any kind."

police station after his arrest, were properly admitted, even if the arrest of the defendant in the condominium on April 8 was invalid because it was made in the course of an illegal entry and search of 103 Cardinal Lane. We disagree.

The question here is whether evidence — in this case shoes — taken from the defendant after his arrest in the course of an unlawful entry or search is the "fruit of the poisonous tree" and thus not admissible, or whether such evidence is untainted and thus admissible. See *Wong Sun* v. *United States*, 371 U.S. 471, 484-488 (1963); *Commonwealth* v. *Damiano*, 444 Mass. 444, 453-454 (2005). In *Commonwealth* v. *Pietrass*, 392 Mass. 892, 900 (1984), this court held that, when police make an arrest within a dwelling after an unlawful warrantless entry, they have "no legal justification for being inside" and can "justify" their seizure of clothes worn by the defendant at the time of the arrest "neither on the basis of the 'plain view' doctrine nor as a search incident to a lawful arrest. Similarly, the clothing taken from the defendant" at the police station after the illegal arrest "must be suppressed as 'fruit of the poisonous tree.' " *Id.*, quoting *Wong Sun* v. *United States, supra.*[36],[37]

In *Commonwealth* v. *Street, supra*, the Appeals Court concluded that the *Pietrass* case had been implicitly overruled on

---

[36]It is settled law that "once the accused is *lawfully* arrested and is in custody, the effects in his possession at the place of detention *that were subject to search at the time and place of his arrest* may lawfully be searched and seized without a warrant" (emphasis added). *United States* v. *Edwards*, 415 U.S. 800, 807 (1974). See generally 3 W.R. LaFave, Search and Seizure § 5.3(a), at 144-155 (4th ed. 2004) (discussing search and seizure of arrestee's effects on arrival at place of detention after lawful arrest). The United States Supreme Court has explicitly cautioned that this rule does not mean constitutional protections against unreasonable search and seizure are "never applicable to postarrest seizures of the effects of an arrestee." *United States* v. *Edwards, supra* at 808.

[37]Evidence obtained subsequent to unlawful police conduct may be admitted if the Commonwealth can prove the evidence "is sufficiently attenuated from the underlying illegality so as to be purged from its taint," *Commonwealth* v. *Damiano*, 444 Mass. 444, 454 (2005), citing *Commonwealth* v. *Fredette*, 396 Mass. 455, 459 (1985); "if the government obtained the evidence through an independent source"; or "if the government can demonstrate that the evidence inevitably would have been discovered by lawful means." *Commonwealth* v. *Fredette, supra*. The Commonwealth does not argue that the defendant's shoes are admissible under the attenuation, independent source, or inevitable discovery doctrines.

the issue whether items seized from a defendant outside the home following an illegal warrantless entry or search are admissible by *Commonwealth* v. *Marquez*, 434 Mass. 370 (2001) (*Marquez*). See *Commonwealth* v. *Street*, *supra* at 308 n.12. In *Marquez*, *supra* at 372, 377-379, we "adopt[ed] the principles enunciated" in *New York* v. *Harris*, 495 U.S. 14 (1990) (*Harris*), that "where the police have probable cause to arrest a suspect, the exclusionary rule [of the Fourth Amendment] does not bar [the admission] *of a statement* made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of [his rights]" (emphasis added). *Marquez*, *supra* at 372 n.1, quoting *Harris*, *supra* at 21. The Appeals Court reasoned that, if the exclusionary rule did not bar the admission of statements made by the defendant outside the home following his arrest in the wake of an illegal home search, then items of clothing seized from the defendant outside the home following his arrest in the wake of an illegal home search must also be admissible.[38] *Commonwealth* v. *Street*, *supra* at 309, citing *Harris*, *supra*, and *Marquez*, *supra*. We conclude that the reasoning in *Marquez* and *Harris* concerning a defend-

---

[38]In support of its holding, the Appeals Court relied on four out-of-State cases. See *Commonwealth* v. *Street*, 56 Mass. App. Ct. 301, 309 (2002). One of these cases, like *Commonwealth* v. *Marquez*, 434 Mass. 370, 377 (2001), and *New York* v. *Harris*, 495 U.S. 14, 20 (1990), did not address the seizure of physical evidence. See *Carranza* v. *State*, 266 Ga. 263, 268 (1996) (defendant's statements made at police station admissible under *Harris*). The other three cases were from intermediate appellate courts and engaged in limited analysis of the issue. See *People* v. *Watkins*, 26 Cal. App. 4th 19, 31 n.8 (1994) ("Under *Harris* . . . a warrantless arrest in the home taints only evidence found as a result of a search of the home. Since the arrest itself is proper, physical evidence taken from the defendant's person at the police station need not be suppressed"); *People* v. *Alexander*, 212 Ill. App. 3d 1091, 1104 (1991) ("While *Harris* refers only to 'statements,' we see no reason why the rule it enunciates should not apply as well to other evidence obtained outside the home, as the argument for excluding statements [in *Harris*] was that they were the 'fruits of an illegal arrest' rather than that there was some basis for distinguishing between statements and other evidence"); *Timmons* v. *State*, 734 N.E.2d 1084, 1086 (Ind. Ct. App. 2000) (stating in dicta, "The facts in *Harris* were such that the Court was only required to determine the admissibility of a statement obtained after an illegal, warrantless arrest in the defendant's home; however, we do not believe application of the rule espoused need be limited only to statements"). We have located no other cases extending the principles in *Harris* to the seizure of items in the possession of a suspect at the time of an arrest, and the Commonwealth cites none.

ant's statements does not extend to the seizure of the defendant's shoes at the police station after he was arrested on the illegal entry of 103 Cardinal Lane.

As we explained in *Marquez, supra* at 377, quoting *Harris, supra* at 20, "the purpose of the warrant requirement for an arrest in the home is 'to protect the home, and *anything incriminating the police gather*[] from arresting [a defendant] in his home' " (emphasis added). The warrant requirement serves an important deterrent purpose: to ensure "the police know that a warrantless entry will lead to the suppression of any evidence *found*, or statements taken, inside the home" (emphasis added). *Harris, supra* at 20. See *Marquez, supra* at 378. We also noted, however, that an "arrest in a home without a warrant but with probable cause" does not render unlawful "continued custody of the suspect once he is removed from the house." *Id.* at 377-378, quoting *Harris, supra* at 18. Thus the *statement* made by the defendant at the police station "was not the product of being in unlawful custody [and] [n]either was it the *fruit of having been arrested in the home rather than someplace else*" (emphasis added). *Marquez, supra* at 378, quoting *Harris, supra* at 19. Upholding "otherwise valid statements given by defendants at the police station" after an "invalid arrest," we concluded, would not weaken the deterrent purpose of the warrant requirement. *Marquez, supra.*

That deterrent purpose would, however, be impaired by allowing the police to acquire items in the defendant's possession at the time of an arrest in the course of an illegal warrantless entry or search. There is a significant difference in the speech at issue in the *Marquez* and *Harris* cases and the item (shoes) seized by the police from the defendant in this case. As an attribute of the person, speech is indistinguishable from the person himself; it goes where he goes, and is not "property" that can be "owned" and "alienated" in the usual sense of those words. On the other hand, physical items in the arrestee's possession that are seized following an illegal warrantless search are "the fruit of [the defendant's] having been arrested in the home rather than someplace else." *Marquez, supra* at 378, quoting *Harris, supra* at 19. The particular clothing, shoes, or other physical items an arrestee is wearing or carrying depend directly

on the time and place of the arrest. Permitting the postarrest seizure of those items in the wake of a warrantless entry or search would invite the police to circumvent the well-settled rule that, in the course of an illegal warrantless entry and search, any physical evidence police take "from the defendant" while still in the home must be suppressed. See *Marquez, supra.* The risk of manipulation is particularly apparent in cases where, as here, the police note the potential evidentiary relevance of a piece of a suspect's clothing while they are still unlawfully in the home. Just as statements made in the course of an illegal entry or search must be suppressed, see *id.*, so, too, must clothing or shoes the defendant was wearing and other items that were in the defendant's possession at the time of entry. We cannot assume the defendant would have been wearing the same shoes had the police proceeded by summons or waited to arrest him lawfully at another time or place. See *Commonwealth* v. *O'Connor*, 406 Mass. 112, 117 (1989) (unlawfully discovered evidence admissible when discovery of evidence "by lawful means was certain as a practical matter").[39] The defendant's shoes should have been be suppressed.

7. *Harmless error.* Having concluded that the evidence seized during the initial entry and search on April 8 and the defendant's shoes, which were seized immediately thereafter at the police station, should have been suppressed, we must now determine whether the erroneous admission of that evidence was "harmless beyond a reasonable doubt." *Chapman* v. *California*, 386 U.S. 18, 24 (1967). See *Commonwealth* v. *Molina*, 439 Mass. 206, 211-212 (2003) (constitutional errors preserved before or during trial reviewed to determine whether they are "harmless beyond a reasonable doubt"); *Commonwealth* v. *Perez*, 411 Mass. 249, 260 (1991) (same). See also *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163-164, cert. denied, 525 U.S. 1007 (1998) (harmless beyond reasonable doubt standard for preserved constitutional errors is more favorable to defend-

---

[39]We cautioned in *Marquez, supra* at 379, that our "adoption of *New York* v. *Harris* does not preclude suppression where there is a connection between unlawfully seized evidence or unlawfully obtained statements and a defendant's later statement." Suppression is similarly appropriate where, as here, there is a connection between the unlawful police activity and the subsequent acquisition of physical evidence.

ant than standards applicable to certain other errors). We have recognized that a constitutional violation gives rise to presumptive prejudice that can be overcome only where the Commonwealth makes an "affirmative showing" of harmlessness beyond a reasonable doubt. *Commonwealth* v. *Rios*, 412 Mass. 208, 214 (1992). *Commonwealth* v. *MacDonald (No. 1)*, 368 Mass. 395, 399 (1975).

In considering the "essential" question "whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the verdicts," *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990), our focus is not on whether the jury could have convicted the defendant had the tainted evidence been excluded; it is not enough for the Commonwealth to demonstrate that its other, properly admitted evidence was "sufficient" to convict the defendant or that the inadmissible evidence was "consistent" with the admissible evidence. *Commonwealth* v. *Dagraca*, 447 Mass. 546, 554-555 (2006). See *Commonwealth* v. *Marini*, 375 Mass. 510, 520-521 (1978) (error not harmless beyond reasonable doubt despite admissible evidence that "would certainly have been enough to warrant a guilty verdict"). Rather, we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts. We look to factors such as "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt." *Commonwealth* v. *Dagraca*, *supra* at 553, and cases cited. See also *Commonwealth* v. *Mahdi*, 388 Mass. 679, 697 (1983) (these factors, though "useful," are "not exclusive or exhaustive"). We apply the principle of harmless beyond a reasonable doubt "with restraint." *Commonwealth* v. *Gilday*, 367 Mass. 474, 498 (1975). An assertion that the error is harmless beyond a reasonable doubt is most particularly vulnerable where the over-all

strength of the Commonwealth's case radiates from a core of tainted evidence. See, e.g., *Commonwealth* v. *Dagraca, supra* at 554 (error not harmless: "By introducing the defendant's improperly procured admissions twice during trial and then highlighting them during closing argument, the prosecutor unmistakably relied on them in a significant way. This was not surprising, precisely because the defendant's admissions to the police were the only direct evidence that he lived in the house").

Here, the prosecutor's closing argument, summarizing the evidence she argued to the jury was the most damaging to the defendant, reveals that the Commonwealth's case stood on a foundation of improperly admitted evidence. The prosecutor repeatedly tied the defendant to the crimes by referring to tainted evidence, and referred to the tainted evidence in order to corroborate the testimony of the police officers and, more important, the critical testimony of Hoffman, who had been called by the Commonwealth and whose credibility was otherwise significantly undermined on cross-examination.[40] The prosecutor told the jury, among other things, that:

> (1) The defendant's shoes seized by the police and the shoe print evidence placed the defendant "at the scene at Sun City Variety that night behind that dumpster exactly where [the store manager] said the man who robbed him was standing," and "also *corroborate*[] the other things that Wayne Hoffman told you" (emphasis added).[41]
>
> (2) The drugs and the crack pipe the police found in the warrantless search of 103 Cardinal Lane on April 8, as

---

[40]Defense counsel had established on cross-examination, and the Commonwealth did not contest, that Hoffman changed his account of crucial events several times, that he had participated in the robbery, that he used drugs, and that his testimony was procured in exchange for leniency.

[41]The jury could not have missed the prosecutor's argument that the shoes were particularly important because they were discovered *on the defendant's feet* — a discovery made possible by the illegal entry and search of 103 Cardinal Lane. The prosecutor emphasized that the shoe prints in the snow at the scene of the robbery matched "the shoes that were found on the defendant's feet less than two hours after that robbery. . . . [T]he shoes that were found on the defendant's feet that night. On the defendant's feet, not in the white box truck, on his feet. Not in a bag in the ceiling in the attic, on his feet. On his feet when he was in that bulkhead when the police arrived . . . . On his feet when they took him out and when he was in there high as a kite . . . . On that man's feet."

well as the defendant's presence in the bulkhead of the unit's basement, were "*consistent* with what Wayne Hoffman *told you* happened that night" (emphasis added).

(3) "[Hoffman] *told you* that they had committed that robbery because they needed money for drugs. He *told you* that they had bought the drugs from the dealer when the dealer arrived at the home after they got back. Gave him the money, they bought drugs, they burned the drugs down to a form where it could be smoked and they smoked them using a crack pipe. That's *consistent* with what the detectives found when they arrived there" (emphasis added).

(4) "You also need to evaluate [Hoffman's] testimony just as you evaluate the testimony of any other witness for credibility. You need to *compare* it to the other evidence in the case. . . . *So compare [Hoffman's testimony] to the other evidence in this case, see what corroborates what he told you*" (emphasis added).[42]

(5) "I would suggest to you doesn't [evidence that only a small amount of drugs were found in 103 Cardinal Lane on April 8] *corroborate* what Wayne Hoffman told you?" (emphasis added).

The repeated emphasis on the improperly admitted evidence in the prosecutor's closing argument — including, among other things, the officers' observations of the defendant's intoxicated state and presence in the basement of the unit and the drugs seized in the course of the warrantless search on the night of April 8, and the discovery of the defendant wearing shoes with soles that matched prints made at the scene of the robbery — reflects the centrality of that evidence to the Commonwealth's case, including the vital importance of inadmissible evidence in shoring up Hoffman's credibility. Indeed, beyond Hoffman's testimony and the fact that the defendant was residing with Markee at 103 Cardinal Lane, no untainted evidence ties the

---

[42]The prosecutor continued: "First of all, he talked about the fact . . . that when [he and the defendant] arrived at home, that they purchased drugs. . . . He told you that they smoked them in this crack pipe which has been marked as Exhibit 8. What did the police find when they came down the stairs? This very crack pipe lit, still smoking."

defendant to the van, the drugs,[43] the guns and the masks, or the store on the night of the robbery. We cannot ignore that the improperly admitted evidence had the dual purpose of both tying the defendant to the crime and supporting Hoffman's credibility, thus intensifying the harm to the defendant's rights. The "cumulative prejudicial effect[s]" of the evidence that should have been excluded, *Commonwealth* v. *Charros*, 443 Mass. 752, 766, cert. denied, 546 U.S. 870 (2005), quoting *Fahy* v. *Connecticut*, 375 U.S. 85, 91 (1963), struck "at the jugular of the defendant's . . . defense" that he was not Hoffman's accomplice. *Commonwealth* v. *Mahdi*, 388 Mass. 679, 697 (1983). The unlawful evidence "contributed to or might have contributed to the verdicts" (citations omitted).[44] *Commonwealth* v. *Molina*, 439 Mass. 206, 212 (2003), quoting *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990). A new trial, conducted in accordance with today's holding, is mandated.

---

[43]The Commonwealth argues that "at trial the defense admitted that the defendant used drugs and was guilty of possession of cocaine." The Commonwealth cites Markee's testimony that the defendant "used drugs" in the basement of 103 Cardinal Lane at unspecified times, a far cry from an admission by the defendant. The Commonwealth also cites defense counsel's closing argument, in which counsel stated the defendant "was doing drugs" when he was arrested. Defense counsel made similar statements in his opening argument. Counsel's statements must be read in light of the motion judge's refusal to suppress the drug-related evidence from the unlawful entry and search on April 8. It is "neither realistic nor fair in the circumstances to place much weight" on counsel's statement as indicia that error was harmless beyond a reasonable doubt. *Commonwealth* v. *Hollister*, 75 Mass. App. Ct. 729, 732 (2009).

[44]This was not a case where we could say, for example, that the improperly admitted evidence was "merely cumulative" of properly admitted evidence, see, e.g., *Commonwealth* v. *Galicia*, 447 Mass. 737, 747-748 (2006) (error harmless beyond a reasonable doubt where improperly admitted statements to responding officers cumulative of properly admitted evidence); or was irrelevant to the contested issue, see, e.g., *Commonwealth* v. *Pena*, ante 1, 15 (2009) (error harmless beyond a reasonable doubt where only contested issue at trial was defendant's mental capacity, and erroneously admitted evidence as to cause and manner of death was not relevant to that issue or was "affirmatively used by defense counsel to illustrate [defendant's] impairment"); or, as that term is correctly understood, that the evidence of guilt was "overwhelming" in the sense that it was so powerful as to "nullify any effect [the illegally obtained evidence] might have had on the jury or the verdict." *Commonwealth* v. *Dagraca*, 447 Mass. 546, 555 (2006). See *Commonwealth* v. *DePace*, 433 Mass. 379, 386 (2001), *S.C.*, 442 Mass. 739 (2004), cert. denied, 544 U.S. 980 (2005) (to overcome presumption of harm, Commonwealth's admissible evidence must be "truly overwhelming").

8. *Conclusion.* For the reasons stated above, the defendant's convictions cannot stand. Accordingly, the judgments are reversed, the verdicts are set aside, and the cases are remanded to the Superior Court for a new trial.

*So ordered.*