NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12858

COMMONWEALTH  vs.  CHARLES F. BOHIGIAN.


Worcester.     February 10, 2020. - November 13, 2020.

Present:  Gants, C.J., Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.[1]


Motor Vehicle, Operating under the influence.  Constitutional
     Law, Blood test.  Due Process of Law, Blood alcohol test.
     Evidence, Blood alcohol test, Voluntariness of statement.
     Consent.



Complaint received and sworn to in the Westborough Division
of the District Court Department on March 24, 2014.

Following transfer to the Worcester Division of the
District Court Department, the case was tried before Andrew M.
D'Angelo, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Erin R. Opperman for the defendant.
Donna-Marie Haran, Assistant District Attorney, for the
Commonwealth.
Jin-Ho King, for Committee for Public Counsel Services &
another, amici curiae, submitted a brief.

_____

[1] Chief Justice Gants participated in the deliberation on
this case prior to his death.

BUDD, J.  The defendant, Charles Bohigian, was convicted of operating a motor vehicle while under the influence of alcohol (OUI), pursuant to G. L. c. 90, § 24 (1) (a) (1); operating a motor vehicle negligently so as to endanger, pursuant to G. L. c. 90, § 24 (2) (a); and OUI causing serious bodily injury, pursuant to G. L. c. 90, § 24L (2), in connection with an automobile accident.[2]  The defendant also was convicted of misleading an investigator pursuant to G. L. c. 268, § 13B, for statements he made at the scene.  He appealed from his convictions, and we subsequently granted his application for direct appellate review.  He argues that the evidence of his blood alcohol level was admitted improperly, as were the statements that formed the basis of the charge of misleading an investigator.

We agree and conclude that the errors require that the defendant's convictions be vacated and the matter remanded to the District Court for a retrial.[3]

Background.  We summarize the relevant facts from the record.  At around midnight on March 23, 2014, Katrina McCarty

---

[2] Count one, operating a motor vehicle while under the influence of alcohol (OUI), merged with count three, OUI causing serious bodily injury.

[3] We acknowledge the amicus brief submitted jointly by the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers.

lost control of her sport utility vehicle (SUV) as she traveled on a highway on-ramp, crashing into the guardrail of the ramp such that her SUV came to rest perpendicular to the roadway, blocking approximately two-thirds of it. Soon thereafter, the defendant crashed into the stationary SUV, rotating it and causing it to hit McCarty, who had been standing on the side of the road next to her vehicle. McCarty sustained serious injuries after being thrown into the path of the defendant's vehicle, and then being dragged underneath the vehicle for over 200 feet as the defendant continued driving.

When State police troopers arrived at the scene, they noted that the defendant had an injury to his forehead and was unsteady on his feet. In addition, his eyes appeared glassy and bloodshot, his speech was slurred, and he had a heavy smell of alcohol on his breath. The defendant told the troopers that "another vehicle had come out of nowhere and run that lady over," and that the operator of that other vehicle told him to "keep his mouth shut."

At the hospital, the treating nurse observed that the defendant exhibited symptoms of a concussion. After the defendant refused to consent to a blood draw, one of the troopers who had responded to the scene applied for, and procured, a search warrant to obtain a blood sample from the

defendant as part of the trooper's investigation into whether the defendant was driving while under the influence of alcohol.

Upon being presented with the signed warrant, the defendant repeated his objection to the blood draw. Subsequently, the defendant's arms and legs were restrained by troopers as the nurse drew two vials of his blood at the direction of one of the troopers. The blood was analyzed, and it was determined that the alcohol content was .135 percent at the time the blood was drawn. A chemist determined that the defendant's blood alcohol level would have been between .16 and .26 at the time of the accident.[4]

Discussion. 1. Blood alcohol content evidence. a. Statutory framework. It is constitutional to draw a person's blood without consent as long as the law enforcement officer has procured a warrant or exigent circumstances make a warrant impracticable. See Missouri v. McNeely, 569 U.S. 141, 148 (2013), citing Schmerber v. California, 384 U.S. 757, 770 (1966); Commonwealth v. Angivoni, 383 Mass. 30, 32 (1981). However, the Legislature has created a statutory scheme specifically to address the testing of blood alcohol content

---

[4] A blood alcohol content (BAC) of .08 percent or above is over the legal limit. See G. L. c. 90, § 24 (1) (a) (1); G. L. c. 90, § 24L (1).

(BAC) in connection with prosecutions for OUI, including the drawing of blood.

General Laws c. 90, § 24 (1) (e), works in tandem with G. L. c. 90, § 24 (1) (f) (1).  Section 24 (1) (e) requires that where a test of a defendant's breath or blood to determine alcohol content is made by or at the direction of a police officer, it must be done with the defendant's consent in order for the results to be admissible in a prosecution for OUI under G. L. c. 90, § 24 (1) (a).[5]  Section 24 (1) (f) (1), known as the "implied consent" statute, provides that, by driving on public roads, all drivers give consent to submit to a BAC test if arrested for OUI.  However, the paragraph goes on to state that "[i]f the person arrested refuses to submit to such test or analysis . . . no such test or analysis shall be made."[6]  G. L.

---

[5] General Laws c. 90, § 24 (1) (e), states in pertinent part:

"In any prosecution for a violation of paragraph (a), evidence of the percentage, by weight, of alcohol in the defendant's blood at the time of the alleged offense . . . shall be admissible and deemed relevant to the determination of the question of whether such defendant was at such time under the influence of intoxicating liquor; provided, however, that if such test or analysis was made by or at the direction of a police officer, it was made with the consent of the defendant . . . ."

[6] General Laws c. 90, § 24 (1) (f) (1), states in pertinent part:

c. 90, § 24 (1) (f) (1). That is, the implied consent that attaches when a driver uses public roadways may be withdrawn, and without actual consent no test is to be done. If the driver refuses the test, he or she is subject to losing his or her license for at least 180 days.[7] Id. Together the two subsections provide that, if an arrestee consents to a BAC test, the results are presumptively admissible at trial for a charge

_____

"Whoever operates a motor vehicle upon any way or in any place to which the public has right to access, or upon any way or in any place to which the public has access as invitees or licensees, shall be deemed to have consented to submit to a chemical test or analysis of his breath or blood in the event that he is arrested for operating a motor vehicle while under the influence of intoxicating liquor; provided, however, that no such person shall be deemed to have consented to a blood test unless such person has been brought for treatment to a medical facility licensed under the provisions of [G. L. c. 111, § 51]; and provided, further, that no person who is afflicted with hemophilia, diabetes or any other condition requiring the use of anticoagulants shall be deemed to have consented to a withdrawal of blood. Such test shall be administered at the direction of a police officer, as defined in [G. L. c. 90C, § 1], having reasonable grounds to believe that the person arrested has been operating a motor vehicle upon such way or place while under the influence of intoxicating liquor. If the person arrested refuses to submit to such test or analysis, after having been informed that his license or permit to operate motor vehicles or right to operate motor vehicles in the commonwealth shall be suspended for a period of at least 180 days and up to a lifetime loss, for such refusal, no such test or analysis shall be made and he shall have his license or right to operate suspended in accordance with this paragraph for a period of 180 days . . . ."

[7] Longer periods of revocation may apply depending upon the arrestee's driving record. See G. L. c. 90, § 24 (1) (f) (1).

of OUI under § 24 (1) (a).  If the arrestee does not consent, however, no test is performed, and the arrestee's license is suspended for at least six months.

The defendant claims that because he was not afforded these statutory protections, the blood draw was unlawful and the BAC test results were inadmissible at trial.  The Commonwealth argues that the blood test results properly were admitted because obtaining a warrant for the blood is an alternative to obtaining consent and, thus, neither § 24 (1) (e) nor § 24 (1) (f) (1) applies.  We agree with the defendant.

The Commonwealth's suggested interpretation, endorsed by the dissent, ignores the plain statutory language that creates a blanket prohibition against blood draws without consent in the context of OUI prosecutions.  See Commonwealth v. Dalton, 467 Mass. 555, 557 (2014), quoting Commonwealth v. Boe, 456 Mass. 337, 347 (2010) ("[t]he meaning of a statute must, in the first instance, be sought in language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms").  Both subsections require consent for OUI blood draws, and neither makes an exception for, or even mentions, warrants.

Pointing to two particular phrases in the provisions, the dissent asserts that we have misread the statutory language.[8] First, § 24 (1) (e) allows for the admission of BAC evidence in an OUI prosecution unless the test was performed without the consent of the defendant "at the direction of a police officer." The dissent concludes, as did the motion judge, that the BAC evidence was admissible because the defendant's blood was drawn pursuant to a warrant issued by a judge rather than "at the direction of a police officer."  Contrary to the view of the dissent, we believe that the limited protection provided by § 24 (1) (e) was available to the defendant; however, in his case, it made no difference.  Section 24 (1) (e) applies only to prosecutions under § 24 (1) (a), which prohibits simple OUI. Had the defendant only been charged under § 24 (1) (a), he would have been able to argue that the BAC evidence was inadmissible because his blood was taken without his consent "at the

---

[8] We note that although the dissent contends that our interpretation of § 24 (1) (e) and (1) (f) (1) is inconsistent with the plain language of the provisions, it is the dissent that seeks to read into the consent requirements of those provisions an exception for search warrants.  See Commonwealth v. Palmer, 464 Mass. 773, 778 (2013), quoting Commonwealth v. Callahan, 440 Mass. 436, 443 (2003) ("In interpreting a statute, '[w]e will not add words to a statute that the Legislature did not put there, either by inadvertent omission or by design'").

direction of a police officer."⁹  G. L. c. 90, § 24 (1) (e).
However, as the defendant additionally was charged with a
violation of § 24L (OUI causing serious bodily injury),
§ 24 (1) (e) had no bearing at all on the admissibility of the
BAC evidence with regard to this more serious charge.¹⁰

It is instead § 24 (1) (f) (1) that is operative here.¹¹
Quite apart from § 24 (1) (e), § 24 (1) (f) (1) flatly and

---

[9] The Appeals Court long ago interpreted § 24 (1) (e) to
apply not only to police officers but to State actors generally:
"We read the statutory exclusion of evidence in G. L. c. 90,
§ 24 (1) (e), to be limited to a defendant's refusal to take
tests to determine the alcohol level of his blood when requested
by the police or other State actors -- in essence incorporating
the State action requirement and protections of art. 12 of the
Massachusetts Declaration of Rights" (emphasis added).
Commonwealth v. Arruda, 73 Mass. App. Ct. 901, 903 (2008).  This
makes sense, as the statutory and regulatory scheme
distinguishes between blood tests performed for medical purposes
and those conducted for investigatory purposes.  Id.  Here,
there is no question that a judge or clerk-magistrate is a State
actor and that the warrant was issued for investigatory
purposes.

Even if we were to adopt the dissent's interpretation of
the statutory language, in applying it to the uncontested facts
of this case, the blood draw indeed was performed "at the
direction of a police officer."  The investigating officer made
the decision to request, obtain, and execute the warrant.  It
seems somewhat disingenuous to maintain that the blood draw was
performed "at the direction of" the judge who signed the warrant
rather than the police officer who sought the warrant and
instructed that hospital personnel perform the draw.

[10] The same can be said for any defendant facing an OUI-
related prosecution that is more serious than simple OUI.

[11] Like § 24 (1) (e), § 24 (1) (f) (1) also contains the
phrase "at the direction of a police officer"; however, the

unambiguously prohibits blood draws without consent for the purposes of analyzing BAC, regardless of who directs it.[12]  See G. L. c. 90, § 24 (1) (f) (1).

The Appeals Court has analyzed the consent requirements of these subsections on multiple occasions and, as recently as last year, reiterated that "in this Commonwealth, a requirement of consent is imposed by statute even when, because there is probable cause and exigent circumstances, one is not imposed by the Federal Constitution."  Commonwealth v. Dennis, 96 Mass. App. Ct. 528, 532 (2019).  Decades prior to Dennis's

_____

phrase is used in a different context.  In § 24 (1) (e), the phrase describes the conditions under which BAC evidence is admissible for OUI prosecutions under § 24 (1) (a).  In contrast, in § 24 (1) (f) (1), the phrase explains how the blood or breath test is to be performed, i.e., "[s]uch test shall be administered at the direction of a police officer, as defined in [G. L. c. 90C, § 1], having reasonable grounds to believe that the person arrested has been operating a motor vehicle upon such way or place while under the influence of intoxicating liquor." G. L. c. 90, § 24 (1) (f) (1).  In this case, because the defendant did not consent, no test should have been performed based on the plain language of the subsection.  See id. ("If the person arrested refuses to submit to such test or analysis . . . no such test or analysis shall be made . . .").

[12] The dissent contends that the reference to "such test" within the phrase "no such test or analysis shall be made" narrowly refers to those tests made at the direction of an officer.  We disagree.  Instead, because the phrase "such test" is used earlier in the provision to refer to the type of test as initially described in the subsection, i.e., a "chemical test or analysis of his breath or blood," we interpret the second reference to "such test" similarly to refer back to the first mention of the test.  See G. L. c. 90, § 24 (1) (f) (1).

publication, the Appeals Court concluded, correctly in our view, that although an individual in the defendant's position has no constitutional right to refuse a BAC or breathalyzer test, "[t]he right of refusal he does have stems from [§ 24 (1) (f) (1)], which requires that a test not be conducted without his consent" (emphasis added).[13]  Commonwealth v. Davidson, 27 Mass. App. Ct. 846, 848 (1989).  Thus, the Appeals Court has made clear that, although it may be constitutional to obtain a blood sample from an unwilling participant with a warrant and probable cause, here in the Commonwealth an involuntary blood draw is statutorily prohibited if it is sought for the purposes of an OUI investigation.  This court similarly has adopted this view.  See Opinion of the Justices, 412 Mass. 1201, 1208 n.6 (1992), citing Davidson, supra at 849 (actual

---

[13] Notably, § 24 (1) (f) (1), requiring actual consent for blood draws for the purposes of determining BAC, was passed one year after the United States Supreme Court decided Schmerber v. California, 384 U.S. 757, 770-771 (1966), which established that blood draws performed without consent are constitutionally permissible with either a search warrant or an exigency exception.  As of 2013, Massachusetts was one of eighteen States that require consent for OUI-related blood draws.  See Missouri v. McNeely, 569 U.S. 141, 161-162 & nn.9 & 10 (2013) (collecting statutes).  In McNeely, the Supreme Court noted that "widespread state restrictions on nonconsensual blood testing provide further support for [the Court's] recognition that compelled blood draws implicate a significant privacy interest."  Id. at 162-163.

consent requirement in § 24 [1] [e] and [1] [f] [1] "reflects a legislative intent to avoid forced testing").[14]

Following the Appeals Court's holding in Davidson, the Legislature amended § 24 (1) (e) and (1) (f) (1) on seven separate occasions, in 1994, 1995, 1996, 2002, 2003, 2005, and 2012. Each time, the language requiring consent -- i.e., "provided . . . that if such test was made by or at the direction of a police officer, it was made with the consent of the defendant" in § 24 (1) (e), and "[i]f the person arrested refuses to submit to such test or analysis . . . no such test or analysis shall be made" in § 24 (1) (f) (1) -- remained unchanged. This is a strong indication that the Legislature approved of the court's statutory construction of these provisions.[15] See Commonwealth v. Colturi, 448 Mass. 809, 812

_____

[14] The dissent acknowledges the Appeals Court holdings of both Dennis and Davidson, referenced supra, but then states: "Neither Dennis nor any other appellate precedent expressly holds that the implied consent statute prohibits a neutral and detached magistrate from issuing a search warrant to obtain evidence of a defendant's blood alcohol test." Post at note 5. This statement is nearly impossible to square with the conclusion reached by the Appeals Court, which we endorsed in 1992. See Opinion of the Justices, 412 Mass. 1201, 1208 n.6 (1992).

[15] We do not share the dissent's view that the Legislature's decision to amend the subsections without altering the language at issue after Davidson was decided is "of no interpretive significance." Post at    .

(2007) (because we presume Legislature is aware of our prior decisions, "reenact[ment of] statutory language without material change" implies adoption of prior construction).

It is well within the Legislature's authority to provide additional privacy protections over and above those granted by the Federal Constitution and the Massachusetts Declaration of Rights.[16]  See Virginia v. Moore, 553 U.S. 164, 171 (2008) ("States [may] choos[e] to protect privacy beyond the level that the Fourth Amendment [to the United States Constitution] requires"); Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 668 (2013), S.C., 471 Mass. 12 (2015). There are valid reasons for doing so, including avoiding the confrontation that occurred during the blood draw conducted in this case.  See Birchfield v. North Dakota, 136 S. Ct. 2160, 2167 (2016), quoting South Dakota v. Neville, 459 U.S. 553, 559 (1983) ("Although it is possible for a subject to be forcibly immobilized so that a sample may be drawn, many States prohibit drawing blood from a driver who resists since this practice helps 'to avoid violent confrontations'").  See also Rochin v.

_____

[16] We are mindful of the concern expressed by the dissent that our interpretation of these subsections may frustrate the over-all purpose of the statute to keep the roadways safe. However, our conclusion is based on the plain language of the statute, and as discussed infra, there are valid reasons for seeking to strike a balance between public safety and the right of a defendant not to be subjected to invasive procedures without his or her consent.

California, 342 U.S. 165, 166, 172 (1952) (due process violation where officers forced tube containing solution into defendant's stomach against his will, causing him to vomit; "the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents -- this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities").

Requiring actual consent for blood draws is also a safety measure. According to the National Center for Biotechnology Information, blood draws involve a variety of risks to the patient, including "pain or bruising at the site of puncture, . . . fainting, nerve damage and haematoma." U.V. Reid, World Health Organization, WHO Best Practices for Injections and Related Procedures Toolkit § 3.1 (Mar. 2010), https://www.ncbi .nlm.nih.gov/books/NBK138496 [https://perma.cc/CR5N-YQWM]. Risks to health care workers and those, like the police officers here who must restrain a patient during the procedure, include exposure to bloodborne pathogens, such as hepatitis B virus, hepatitis C virus, human immunodeficiency virus, syphilis, and malaria. Id. Health care workers and others participating in the procedure also must worry about "sharps injuries" caused during the use and disposal of the needle. Id. These risks are only amplified where the patient does not consent to the blood draw. Notably, § 24 (1) (f) (1) specifically states that "no

person who is afflicted with hemophilia, diabetes or any other condition requiring the use of anticoagulants shall be deemed to have consented to a withdrawal of blood," no doubt in an effort to ensure that the health of such persons in not endangered by a blood draw.

Finally, Massachusetts is not alone in having crafted such a statutory scheme.  In McNeely, the Supreme Court noted that "a majority of States either place significant restrictions on when police officers may obtain a blood sample despite a suspect's refusal . . . or prohibit nonconsensual blood tests altogether." McNeely, 569 U.S. at 161 & n.9.  Courts in States with statutes nearly identical to ours similarly have interpreted them to bar blood draws absent consent, regardless of whether police have obtained a warrant.

For example, the Rhode Island Supreme Court interpreted the following language in the State's implied consent statute: "[i]f a person having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests, . . . none shall be given" (emphasis in original).  State v. DiStefano, 764 A.2d 1156, 1161 (R.I. 2000), quoting R.I. Gen. Laws § 31-27-2.1(b).  The court "conclude[d] that the language 'none shall be given' is plain and unambiguous . . . , and that, upon such a refusal, a test shall not be given, with or without a warrant."  DiStefano, supra at 1163.

The Alaska Supreme Court addressed this issue in Pena v. State, 684 P.2d 864, 866 (Alaska 1984).  The Alaska statute at the time provided:  "If a person under arrest refuses the request of a law enforcement officer to submit to a chemical test of his breath . . . a chemical test shall not be given." Id., quoting Alaska Stat. § 28.35.032.  The court stated:  "The statute clearly provides that after a driver refuses to submit to a chemical sobriety test the driver shall be penalized by [license suspension] but that no test shall be given."  Pena, supra at 867.  Therefore, the court held that the statute "preclude[s] chemical sobriety tests performed pursuant to search warrants."  Id.

And the Georgia Supreme Court interpreted a statute that provided that "[i]f a person under arrest . . . refuses, upon the request of a law enforcement officer, to submit to a chemical test . . . , no test shall be given" (emphasis in original).  State v. Collier, 279 Ga. 316, 317 (2005), quoting Ga. Code Ann. § 40-5-67.1(d).  The court held that the statute "clearly prohibits the giving of any chemical test once the suspect refuses to submit to the requested one.  It makes no provision for the police to then attempt to obtain a search warrant."  Collier, supra at 318.

Thus, just as in DiStefano, Pena, and Collier, the plain language of our statutory scheme makes clear that testing shall

not be done absent consent, and that any nonconsensual testing done at the direction of the police is inadmissible.[17]

b. <u>Application</u>. Here, it is clear that the blood draw was performed without the defendant's actual consent (and, in fact, against his will). The defendant repeatedly objected to the blood draw, and in the end, several officers pinned him down and handcuffed him, while a nurse extracted his blood. The blood draw thus was impermissible under § 24 (1) (<u>f</u>) (1), and consequently, the BAC test results were admitted improperly at trial.[18] See <u>Commonwealth</u> v. <u>Tyree</u>, 455 Mass. 676, 700 (2010).

---

[17] We note that the Legislatures in Rhode Island and Georgia subsequently amended their statutes to permit nonconsensual blood draws pursuant to a search warrant. See R.I. Gen. Laws § 31-27-2.9(a), inserted by R.I. St. 2009, c. 09-210, § 2; <u>McAllister</u> v. <u>State</u>, 325 Ga. App. 583, 585 (2014), citing Ga. Code Ann. § 40-5-67.1(d.1). Alaska enacted a new statute allowing for chemical testing absent consent if a defendant were arrested for OUI after an accident resulting in death or physical injury to another. See <u>Pena</u> v. <u>State</u>, 684 P.2d 864, 867 (Alaska 1984), citing Alaska Stat. § 28.35.035.

The dissent argues that the statutory amendments that were enacted following these State courts' interpretations of their respective implied consent statutes are proof that those courts incorrectly interpreted the statutes in the first place. We take the opposite view. Those courts based the interpretation of their respective statutes on the plain statutory language. The State Legislatures that subsequently amended the statutes did so because they were not satisfied with the consequences resulting from the enforcement of the statutes they enacted.

[18] As discussed <u>supra</u>, § 24 (1) (<u>e</u>) applies only to prosecutions under § 24 (1) (<u>a</u>), i.e., OUI. Because the defendant additionally was charged under § 24L (OUI causing serious bodily injury), the defendant did not benefit from the limited protection of § 24 (1) (<u>e</u>).

As the defendant raised this issue by way of a motion in limine, we review for prejudicial error.  Commonwealth v. Grady, 474 Mass. 715, 718-719 (2016).  That is, "we must now determine whether the erroneous admission of that evidence was 'harmless beyond a reasonable doubt.'"  Tyree, 455 Mass. at 701-702, quoting Chapman v. California, 386 U.S. 18, 24 (1967).  The Commonwealth highlighted the blood draw and results during the trial and, in closing arguments, relied exclusively on the blood draw to prove that the defendant was under the influence.  The BAC results introduced by the Commonwealth provided the strongest proof that the defendant was intoxicated at the time of the accident.  Proof of intoxication was central to proving the defendant's guilt of both OUI causing serious bodily injury (§ 24L) and negligent operation (§ 24 [2] [a]).  See Commonwealth v. Zagwyn, 482 Mass. 1020, 1022 (2019) ("evidence of an operator's intoxication is relevant to a charge of negligent operation").  We therefore cannot say that the tainted evidence was harmless beyond a reasonable doubt.[19]

---

[19] In the alternative, the defendant argues that prior to his blood being drawn without consent, he was entitled to a hearing before a judge pursuant to Matter of Lavigne, 418 Mass. 831, 835-836 (1994).  In that case, the Commonwealth sought a sample of the defendant's blood to compare it to blood found at a crime scene.  Id. at 833.  Because consent is required for blood draws in connection with OUI investigations by statute, a Lavigne hearing would not be necessary in such cases.  Instead, as discussed supra, no blood draw shall take place.

2.  Voluntariness of statements.  The defendant was convicted of misleading an investigator pursuant to G. L. c. 268, § 13B, based on the statements he made to the responding officers at the accident scene suggesting that the driver who caused the accident had fled the scene.  He argues that the conviction should be vacated because, given the head injury he sustained in the accident, an inquiry into the voluntariness of his statements should have been made even without a request from trial counsel.  We review the claim for a substantial risk of a miscarriage of justice.  Commonwealth v. Randolph, 438 Mass. 290, 294-295 (2002).

In order to use a defendant's statements against him or her at trial, they must have been made voluntarily.  See Commonwealth v. Brown, 449 Mass. 747, 765 (2007), citing Commonwealth v. Sheriff, 425 Mass. 186, 192 (1997).  "If the defendant does not raise the issue of voluntariness, the judge has a sua sponte obligation to conduct a voir dire only if the voluntariness of the statements is a live issue such that there is evidence of a substantial claim of involuntariness" (quotation and citation omitted).  Brown, supra.  See Commonwealth v. Gallett, 481 Mass. 662, 686 (2019), quoting Commonwealth v. Kirwan, 448 Mass. 304, 318 (2007) (for question of voluntariness to be considered live issue, "substantial evidence of involuntariness [must be] produced").  Further, a

judge must provide a humane practice instruction to the jury, i.e., that they must find that the defendant's statements were voluntary beyond a reasonable doubt before considering them. Commonwealth v. Rosario, 477 Mass. 69, 72 n.7 (2017).

Given the relationship between the defendant's head injuries and his mental condition, the voluntariness of his statements was a live issue at trial. Trial counsel discussed the head injuries that the defendant sustained in both the opening statement and closing argument, noting in the closing that the defendant "wasn't fine" when he responded to officers' questions at the accident scene. Trial counsel questioned the responding officers as well as the treating nurse about the defendant's head wounds. The nurse testified that the defendant, who had glass imbedded in his head from the accident, showed signs of having sustained a concussive head trauma, including repeating himself "quite often" and being lethargic.

The judge erred by failing to make an independent determination regarding voluntariness and by failing to give a humane practice instruction to the jury. Because the statements the defendant made were offered by the Commonwealth and formed the basis for the charge of misleading an investigator, the error created a substantial risk of a miscarriage of justice. We therefore vacate the defendant's conviction under G. L. c. 268, § 13B.

<u>Conclusion</u>.  In conclusion, we vacate the defendant's convictions of OUI causing serious bodily injury and misleading an investigator and remand the case to the trial court for proceedings consistent with this ruling.

<u>So ordered</u>.

LOWY, J. (dissenting, with whom Kafker, J., joins).  The court observes that "[t]he [blood test] results introduced by the Commonwealth provided the strongest proof that the defendant was intoxicated at the time of the accident."  Ante at    .  I agree.  Indeed, this was the Legislature's precise intent when it reframed the preexisting statutory scheme for controlling substance-impaired driving in objective terms of blood alcohol content.  See St. 1961, c. 340, and discussion infra.  Chemical analysis of blood alcohol content, although hardly foolproof, is not subject to testimonial infirmities such as failure of memory, misperception, ambiguity in communicating observations to the trier of fact, and lack of sincerity.  By placing new emphasis on collecting blood alcohol content evidence from suspected offenders, the Legislature both reduced exclusive reliance on witness perception and testimony to determine the extent of a defendant's intoxication and afforded protection to suspects whose symptoms of impairment were not a result of alcohol consumption.  Yet the court holds that the Legislature intended to exclude blood alcohol content evidence from a prosecution for operating a motor vehicle while under the influence of alcohol (OUI) if police obtained it pursuant to a search warrant absent consent, because the provisions of G. L. c. 90, § 24 (1) (e) and (f) (1) (subsections [e] and [f] [1]), require the defendant's consent to perform or admit the results

of any blood alcohol test made "at the direction of a police officer." Ante at      .

This interpretation is inconsistent with the plain language and purpose of subsections (e) and (f) (1).  The ordinary meaning of the words composing these provisions confines their scope to blood alcohol tests performed "at the direction of a police officer."  See ante at note 5 (text of subsection [e]), and note 6 (text of subsection [f] [1]).  Properly construed, those provisions do not require consent for blood drawn pursuant to a search warrant issued by a neutral and detached magistrate, upon a finding of probable cause.  The magistrate's decision to issue a warrant bears no relation to a suspected offender's consent, nor does it implicate the regulatory apparatus of implied consent or its effects on evidentiary admissibility.

Moreover, the court's holding frustrates the overriding purpose of G. L. c. 90, § 24, to enhance the safety of the Commonwealth's roadways by deterring substance-impaired driving. See Commonwealth v. Colturi, 448 Mass. 809, 812-813 (2007) (public safety purpose of statutory scheme well established). Collection and use of blood alcohol content evidence is the statute's principal engine of enforcement:  The Legislature crafted subsections (e) and (f) (1) to fuel that engine by imposing an efficient, consent-based procedure for warrantless, police-directed testing.  The Legislature's consistent efforts

to encourage and to promote the collection of blood alcohol content evidence within constitutional bounds belies any suggestion of legislative intent to enable a defendant to prohibit an alternative, constitutionally compliant procedure by withholding his or her consent.

This is especially true where prohibiting that alternative procedure would allow repeat offenders to shield themselves from conviction at a disturbing rate by declining to submit to forensic testing.[1]  See, e.g., Senate Committee on Post Audit and Oversight, Current Drunk Driving Deterrence, foreword (Oct. 1987) (noting distressing fifty percent increase in breath test refusals over past year, depriving prosecutors of vital evidence).  Repeat offenders, due to their previous arrest, are typically aware of the inadmissibility of a refusal to take a breathalyzer test.  Thus, repeat offenders may avoid conviction, in part, because the prosecutor or judge cannot explain to the jury why there was no forensic evidence of blood alcohol content presented at trial.  The privilege against furnishing evidence

---

[1] In a case where a defendant refuses to submit to a test establishing blood alcohol content, it is often difficult for the prosecution to carry its burden of proof on the element of impairment.  Only approximately thirty-one percent of all jury trials of OUI charges disposed of in the District Court and Boston Municipal Court Departments of the Trial Court over the past three calendar years (2017-2019) resulted in conviction. Harsh statutory penalties for subsequent convictions have little deterrent effect where the likelihood of conviction is significantly diminished upon refusing to submit to testing.

of one's own guilt under art. 12 of the Massachusetts Declaration of Rights precludes the admission of evidence that a defendant refused a test given at the direction of the police. Opinion of the Justices, 412 Mass. 1201, 1211 (1992). The confluence of these factors thus impedes the Legislature's consistent efforts both to promote the use of blood alcohol content evidence at trial to deter substance-impaired driving in general, and to ensure effective sanctions for repeat offenses in particular. Because I discern neither a constitutional nor a statutory obstacle to admitting evidence of the defendant's blood alcohol content obtained pursuant to a search warrant issued upon probable cause, I respectfully dissent.

1. "Plain" meaning of statutory language. "[T]he primary source of insight into the intent of the Legislature is the language of the statute." International Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983). The plain language of subsections (e) and (f) (1) neither prohibits a neutral and detached magistrate from issuing a search warrant to draw and test a defendant's blood to determine its alcohol content, nor forbids police from reasonably executing one. See Plymouth Retirement Bd. v. Contributory Retirement Bd., 483 Mass. 600, 605 (2019) ("Even clear statutory language is not read in isolation").

a.  "[A]t the direction of a police officer."  The admissibility, consent, and refusal provisions of subsections (e) and (f) (1) each regulate only postarrest blood alcohol content tests made "at the direction of a police officer."  In denying this defendant's motion in limine to exclude the blood alcohol content evidence, the trial judge explained that a search pursuant to a "properly executed search warrant is not a search that requires the consent of the [defendant] or that is 'made by or at the direction of a police officer.'"  I agree.

This is not mere semantics.  The language of the search warrant issued by the magistrate in this case could not more plainly reflect that it is an order of the court, expressly directed to law enforcement:

> "I find that there is PROBABLE CAUSE to believe that the property described below . . . is evidence of a crime or is evidence of criminal activity.  YOU ARE THEREFORE COMMANDED within a reasonable time . . . to search for the . . . blood of [the defendant] . . . which is . . . on the person or in the possession of [the defendant]."

When a defendant's blood is drawn and tested pursuant to such a warrant, issued by order of "a neutral and detached magistrate instead of being judged [appropriate] by the officer engaged in the often competitive enterprise of ferreting out crime" (citation omitted), Schmerber v. California, 384 U.S. 757, 770 (1966), the defendant's consent is immaterial, see Commonwealth

v. Delaney, 442 Mass. 604, 611 (2004) ("suspect has no lawful option but to comply with the warrant").

"The Legislature's silence on [a] subject cannot be ignored," Commonwealth v. Nascimento, 479 Mass. 681, 684-685 (2018), quoting Roberts v. Enterprise Rent-A-Car Co. of Boston, 438 Mass. 187, 193 (2002), and neither subsection (e) nor subsection (f) (1) proscribes or, as the court concedes, ante at , "even mentions" warrants. The law affords suspected offenders a statutory means to check officers' discretion, dispensing with any opportunity for unwarranted State infringement of bodily security, as in Rochin v. California, 342 U.S. 165, 172 (1952). Absent express prohibition of a magistrate's issuance of a search warrant for an arrestee's blood alcohol content, I decline to read one into the statutory silence. In a closely related context, this court recently acknowledged the substantial difference between the summary action of an officer in the field and the officer's action following the deliberate decision of an impartial court, and then reasoned that this procedural discrepancy constituted a reasonable basis for the Legislature to impose distinct statutory consequences flowing from each. See Nascimento, supra at 684 (declining to expand application of mandatory imprisonment provision where Legislature was silent, and differentiating between suspension for failing breath test effected by officer's summary

confiscation under G. L. c. 90, § 24 [f] [2], and suspension according to judicial determination following arraignment in open court under G. L. c. 90, § 24N).  Here, since a magistrate's "informed, detached and deliberate [probable cause] determination[]" to issue a warrant for a blood test, Schmerber, 384 U.S. at 770, and the requirement that police execute it in a reasonable manner already each protect a defendant's individual interest against unreasonable government intrusions, including against intrusions upon bodily security, there was no need for the Legislature to create additional statutory limits on or otherwise acknowledge the default availability of traditional warrant procedure.

The court nonetheless attempts to dismiss the limiting effect of the phrase "at the direction of a police officer" in subsection (e) by broadly construing "police officer" to encompass "any State actor," including a magistrate.[2]  Ante at

_____

[2] The court states that the dissent is "somewhat disingenuous to maintain that the blood draw was performed 'at the direction of' the judge who signed the warrant rather than the police officer who sought the warrant and instructed that hospital personnel perform the draw."  Ante at note 9.  To the contrary, the critical importance of this distinction is, in part, what inspired John Adams's authorship of art. 14 of the Massachusetts Declaration of Rights, and shaped the Fourth Amendment to the United States Constitution.  See generally T.K. Clancy, The Framers' Intent:  John Adams, His Era, and the Fourth Amendment, 86 Ind. L.J. 979 (2011) (discussing Adams's part in drafting art. 14 and its influence on Fourth Amendment, with particular attention to over-all goal of establishing

note 9, citing the Appeals Court rescript opinion in

Commonwealth v. Arruda, 73 Mass. App. Ct. 901, 903 (2008).  That

reasoning only makes sense in the context of the evidentiary

admissibility of a defendant's refusal to submit to a blood

alcohol test under subsections (e) and (f) (1), since art. 12

precludes any State actor from compelling a defendant to furnish

testimonial evidence of his or her own guilt.  That

constitutional concern is not implicated here, however, because

the issue is the admissibility of the defendant's blood alcohol

---

objective criteria to justify governmental intrusion upon
individuals' security).  Although colonial Massachusetts lacked
organized police forces, its inhabitants were intimately
familiar with the intrusive customs searches authorized by
Parliament and the Crown.  See id. at 989-991.  In 1761, James
Otis famously denounced the general warrants, or "Writs of
Assistance," granted in furtherance of customs inspections as
"the worst instrument of arbitrary power . . . that places the
liberty of every man in the hands of every petty officer."  J.
Adams, Abstract of the Argument for and against the Writts of
Assistance (circa Apr. 1761), in 2 Legal Papers of John Adams,
at 140, 142 (L.K. Wroth & H.B. Zobel, eds., 1965).  The
uncontrolled discretion afforded to customs officials under such
writs was the chief complaint.  See Clancy, supra at 991-922.
John Adams and the other founders thus recognized the importance
of enshrining a right to be free from discretionary searches,
and they understood that they could best protect liberty by
establishing objective criteria to govern when a search should
be legally authorized in a specific case, as "determin'd by
adequate and proper judges" as opposed to "petty tyrants"
(citations omitted).  Id. at 994.  While both a search "at the
direction of the police" and a search authorized by a valid
search warrant constitute State power, the former resembles the
untrammeled discretion granted to searching customs officers,
against which our constitutions protect, and the latter
represents the preferred procedure to ensure that discretionary
police actions do not trample individual security.

content, obtained pursuant to a valid search warrant, and not the defendant's refusal to submit to blood alcohol content testing.  Article 12 and its doctrinal tests are not implicated where real or physical evidence is concerned.[3]  See Commonwealth v. Brennan, 386 Mass. 772, 783 (1982) (neither breathalyzer test nor field sobriety tests communicative to extent necessary to evoke art. 12 privilege).

b.  "[No] such test . . . shall be made."  The court's conclusion that subsections (e) and (f) (1) "create[] a blanket prohibition against blood draws without consent in the context of OUI prosecutions," ante at    , hinges upon two critical errors.  The first is its inaccurate reading of "a test [made or administered] at the direction of a police officer," as it appears in subsections (e) and (f) (1), to encompass blood alcohol evidence collected pursuant to a warrant, discussed above.  The second is an overly broad construction of what

---

[3] The court's citation to Commonwealth v. Arruda, 73 Mass. App. Ct. 901, 903 (2008), is not dispositive, since it involved admissibility of testimonial refusal evidence, not bodily fluids.  Although, in that context, it made some sense for the Appeals Court to interpret the subsection (e) provision excluding evidence that a defendant refused a test administered "at the direction of a police officer" to encompass a test at the direction of any State actor, that reading makes no sense here.  The concept of "State action" also applies to determining violations of the Fourteenth Amendment to the United States Constitution, but that doctrine is irrelevant here as well, since no Federal constitutional claims are at issue.

constitutes a "test or analysis" in the following provision of subsection (f) (1):

> "If the person arrested refuses to submit to such test or analysis, after having been informed [that such refusal will result in license suspension of at least 180 days], no such test or analysis shall be made" (emphasis added).

G. L. c. 90, § 24 (1) (f) (1).  In this portion of subsection (f) (1), "such test or analysis" means the breath or blood test "administered at the direction of a police officer" to which "[w]hoever operates a motor vehicle upon any [public] way . . . shall be deemed to have consented to submit . . . in the event that he is arrested for [OUI]."[4]  Id.  Confined as they are to tests "at the direction of a police officer," the implied consent and refusal provisions in subsection (f) (1) simply have no application to the collection of blood alcohol content

---

[4] The court's reading of "such test" as referring to any breath or blood test for purposes of determining blood alcohol content, rather than one specifically administered "at the direction of a police officer" is unworkable, both grammatically and substantively.  See ante at note 11.  A generally accepted rule of English syntax dictates that a demonstrative adjective generally refers to the nearest reasonable antecedent.  See A. Scalia & B.A. Garner, Reading Law:  The Interpretation of Legal Texts 144-146 (2012) (discussing "last antecedent" canon of interpretation).  Here, "no such test . . . shall be made" refers back to "such test" as the arrestee "refuses to submit," which in turn refers to the test that "shall" be administered by a police officer.  More fundamentally, the only test contemplated by subsection (f) (1) is the one that "shall" be administered at police direction, because the very purpose of the implied consent law is to encourage cooperation with police requests to submit to testing.  It is the refusal to submit to that police request that triggers the license suspension and means no test is administered at police direction.

evidence pursuant to a warrant.  In other words, the court is correct when it observes that neither subsection (e) nor subsection (f) (1) "even mentions warrants." Ante at    .  As such, the statute neither implies a driver's consent to a blood draw pursuant to a warrant nor affords any attendant possibility of refusal.  Neither is there any express prohibition of a magistrate issuing a warrant to draw and test blood of a person under arrest for OUI.  Indeed, no express exception is necessary, since obtaining a warrant is the default procedure for complying with the reasonableness requirement imposed by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.  See, e.g., Commonwealth v. Tyree, 455 Mass. 676, 683 (2010) ("presumption against warrantless searches reflects the importance of the warrant requirement to our democratic society").

Moreover, since neither the statutory language nor prior appellate construction[5] expressly precludes the use of warrant

---

[5] The Appeals Court recently acknowledged that, "in this Commonwealth, a requirement of consent [to a warrantless blood draw] is imposed by statute even when . . . one is not imposed by the Federal Constitution." Commonwealth v. Dennis, 96 Mass. App. Ct. 528, 532 (2019), citing Commonwealth v. Davidson, 27 Mass. App. Ct. 846, 848-849 (1989) (recognizing statutory "right" to refuse test precluding warrantless compulsion of test despite presence of probable cause and exigent circumstances). Neither Dennis nor any other appellate precedent expressly holds that the implied consent statute prohibits a neutral and

procedure to recover admissible evidence of a defendant's blood alcohol content, the Legislature's repeated amendment of subsections (e) and (f) (1) without change to their fundamental admissibility, consent, and refusal provisions is of no interpretive significance.  See ante at    , quoting Colturi, 448 Mass. at 812.  See also Commonwealth v. Dayton, 477 Mass. 224, 227 (2017) ("It is one thing to infer the Legislature's intent based on an implied awareness of our express holdings; it is quite another to infer it based on dictum in our opinions").[6]

2.  Frustration of purpose.  The court's interpretation of subsections (e) and (f) (1) impermissibly frustrates the public

_____

detached magistrate from issuing a search warrant to obtain evidence of a defendant's blood alcohol test.

[6] The same principle applies to the Appeals Court's aside in Davidson, 27 Mass. App. Ct. at 849, postulating that at the time the Legislature added subsection (e) in 1961, "[t]he purpose of the provisions regarding actual consent (as opposed to the implied consent established by the first sentence of § 24 [1] [f]) seems to have been to avoid forced testing -- i.e., testing by means of physical compulsion -- that was thought after Rochin v. California, 342 U.S. 165 (1952), to be of dubious constitutional validity."  This court later restated that observation in a footnote.  See Opinion of the Justices, 412 Mass. 1201, 1208 n.6 (1992) (responding to Senate's reported question regarding constitutionality of proposal to make refusal evidence admissible as additional inducement to submit to test).  More fundamentally, intent to prevent police from physically compelling submission to testing in the absence of a warrant, and to deter the type of egregious, warrantless police abuse that occurred in Rochin, need not preclude use of reasonable force in police execution of a valid search warrant, issued upon a magistrate's finding of probable cause.

safety purpose of the larger statutory scheme laid out in G. L.

c. 90, §§ 24-24X.  See Saccone v. State Ethics Comm'n, 395 Mass.

326, 334 (1985) (where "literal import of any particular clause

or section" is inconsistent with "the general meaning and object

of the statute," court must interpret "according to the spirit

of the act" [citation omitted]).  This court has held that the

general purpose of that statutory scheme is to "protect the

public from drivers whose judgment, alertness, and ability to

respond promptly and effectively to unexpected emergencies are

diminished because of the consumption of alcohol.'"[7]  Colturi,

---

[7] The present case concerns precisely this type of impaired
ability to respond to the unexpected -- here, the disabled
vehicle of another substance-impaired motorist who had crashed
her sport utility vehicle (SUV) into the guardrail of a highway
onramp, coming to a stop in the middle of the ramp, almost
perpendicular to the road.  In the expert opinion of the State
trooper who performed the accident reconstruction analysis in
this case, ninety-five percent of the population, traveling at
the advisory speed limit of 30 miles per hour on the same road
and at the same time of night (i) could have seen the stopped
SUV from in excess of 200 feet away (and certainly no less than
149 feet away), and (ii) reacted in time to brake and come to a
complete stop within a distance of 142 feet, avoiding collision.
The expert also opined that, alternatively, there was 8.75 feet
of open road between the SUV and curb, and a further 6.50 feet
from the curb to the guardrail, to allow a driver to maneuver
around the disabled vehicle.  Unable to engage in the requisite
type of split-second decision-making and action necessary to
avoid collision, the impaired defendant instead initiated a
chain of events that ended with the victim trapped beneath the
defendant's car, which dragged the victim along the road beneath
it for some 257 feet before dislodging her, alive but critically
injured.

448 Mass. at 812-813, quoting <u>Commonwealth</u> v. <u>Connolly</u>, 394 Mass. 169, 172-173 (1985).

Since the 1906 enactment of its statutory predecessor, St. 1906, c. 412, § 4 (mandating punishment for motor vehicle operation "while under the influence of intoxicating liquor" by maximum fine of one hundred dollars or imprisonment for up to six months), the Legislature frequently has amended G. L. c. 90, § 24, seeking to enhance the statute's public safety purpose through increasingly effective mechanisms to deter substance-impaired driving.  See, e.g., St. 1909, c. 534, § 22 (doubling maximum fine for first offense; mandatory prison term of at least one year, not to exceed two years, upon conviction of second offense); St. 1913, c. 123, § 1 (increased punishment for first offense, to include imprisonment for at least two weeks but not to exceed two years, maximum fine of $200, or both); <u>Commonwealth</u> v. <u>Lyseth</u>, 250 Mass. 555, 558 (1925) (interpreting statute punishing driving "while under the influence of intoxicating liquor" in accordance with plain language and "purpose . . . to regulate the use of motor vehicles on the public ways, in the interests of the public welfare"); St. 2003, c. 28, § 1 (adding new "per se" violation to G. L. c. 90, § 24 [1] [<u>a</u>] [1], operating motor vehicle "with a percentage, by weight, of alcohol in [the] blood of eight one-hundredths or greater," as alternative to operating "while under the influence

of intoxicating liquor"); Colturi, 448 Mass. at 813 ("It is beyond reasonable dispute that, in adding a per se violation to the OUI statute, the Legislature intended to strengthen the protections afforded the public from drivers who might be impaired by the consumption of alcohol").  Since 1961, many of these amendments have promoted the Legislature's intent to encourage OUI arrestees to take a blood alcohol test, to "provid[e] the most reliable form of evidence of intoxication for use in subsequent proceedings," and thereby assist the Commonwealth in carrying its burden of proof beyond a reasonable doubt, or otherwise exculpating the defendant.  Mackey v. Montrym, 443 U.S. 1, 19 (1979).

In 1961, the Legislature first enacted a statutory presumption that a person was under the influence when his or her blood alcohol content exceeded a set limit.  G. L. c. 90, § 24 (1) (e), inserted by St. 1961, c. 340.  That amendment yoked enforcement of G. L. c. 90, § 24, to an accurate determination of a defendant's blood alcohol content and to introducing that evidence to establish impairment at a criminal trial for OUI.  See id. (blood alcohol content as measured by chemical test "deemed relevant" to establishing "under the influence" element of offense).  Absent a defendant's consent, however, results of a blood alcohol test performed "by or at the direction of a police officer" were inadmissible.  Id.  In 1967,

the Legislature added subsection (f), incorporating a remedial sanction into the existing deterrence scheme by mandating an automatic ninety-day license suspension for any driver arrested for OUI who refused to take a breath test despite notice of the consequence.  G. L. c. 90, § 24 (1) (f), inserted by St. 1967, c. 773.  The court's theory that the Legislature intended those amendments to create an absolute individual statutory right to refuse submission to a blood alcohol content test, ante at    , is not supported by the historical record.  There is no basis to suggest that any legislative concern to guard against potential police abuse or afford arrestees due process extended to tests conducted under the authority of a valid warrant.

Contrary to the court's suggestion, ante at note 12, it is unlikely that the enactment of Massachusetts's implied consent law in December of 1967 had much, if any, connection to the June 1966 release of the United States Supreme Court's decision in Schmerber, 384 U.S. at 770-771 (upholding warrantless blood test of unconscious driver performed by doctors at police request, due to exigent circumstances and probable cause).  The conventional wisdom attributes States' adoption of implied consent laws to "the intent of the statutory draftsmen to

obviate the element of physical coercion."[8]  Rosenberg,

Compulsory Intoxication Tests:  A Suggestion for Massachusetts,

50 Mass. L.Q. 145, 156 (1965).  See Bruns, Driving While

Intoxicated and the Right to Counsel:  The Case Against Implied

Consent, 58 Tex. L. Rev. 935, 941-942 (1980).  Yet both the

timing and the content of the Massachusetts implied consent law

more likely resulted from the influence of familiar, court-

approved formulations in widely adopted model statutes and

powerful Federal financial incentives.  See Bruns, supra at 959

(concluding that States' implied consent laws are "as much a

result of historical snowballing as of a considered choice by

legislatures").

Most of the language comprising Massachusetts's implied

consent law had been operative in many other States' statutes

for more than a decade before the 1967 Legislature added them to

---

[8] Despite the express intent of the Supreme Court majority
that its opinion in Rochin, 342 U.S. at 174, not implicate the
"use of modern methods and devices for discovering wrongdoers
and bringing them to book," Rochin does appear to have raised
certain lingering doubts about the constitutionality of
compelled testing, less due to the majority's opinion that
police use of "force so brutal and so offensive to human dignity
in securing evidence from a suspect" offended due process and
rendered such evidence inadmissible, id., and rather more due to
Justice Douglas's concurring opinion that "words taken from [a
defendant's] lips, capsules taken from his stomach, blood taken
from his veins are inadmissible provided they are taken from him
without his consent" based upon the privilege against self-
incrimination under the Fifth Amendment to the United States
Constitution.  Id. at 179 (Douglas, J., concurring).

G. L. c. 90, § 24.  In 1953, New York's Legislature enacted the nation's first implied consent statute.  See N.Y. Veh. & Traf. Law § 71-a, inserted by 1953 N.Y. Laws c. 854.  That enactment followed the recommendation of a joint legislative committee appointed to study "the apparent inability of our police and courts to effectively enforce laws forbidding driving while under the influence of intoxicating beverages."  Interim Report of the New York State Joint Legislative Committee on Motor Vehicle Problems:  Chemical Tests for Intoxication, N.Y. Leg. Doc. No. 25, at 9 (Jan. 1953) (Interim Report).  See Schutt v. Macduff, 205 Misc. 43, 46 (N.Y. Sup. Ct. 1954) (law responded to "urgent need" to promote "procurement of chemical tests for the purpose of definitely determining whether or not an accused driver was intoxicated to the extent of impairing his driving ability").  In its comprehensive report, the New York committee explained that, despite its own legal conclusion that compelled submission to testing would not violate any constitutional right, the proposed statute entirely avoided any question of a constitutional right to resist the test by providing "the accused . . . the choice of waiving his [constitutional right] -- assuming such a right exists -- or losing the privilege to continue driving on our highways."  Interim Report, supra at 26.

By February of 1957, it was clear that the United States Constitution posed no obstacle to "so slight an intrusion as is

involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day." Breithaupt v. Abram, 352 U.S. 432, 439 (1957).  Still, the National Conference of Commissioners on Uniform State Laws adopted the Uniform Chemical Tests for Intoxication Act, modeled on the New York language, as amended by 1954 N.Y. Laws c. 320, in July of that same year.  See Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Annual Conference, at 129, 216-229 (1957). "Thus [implied consent] legislation conceived to overcome a constitutional obstacle gained institutional momentum at the very time that the United States Supreme Court removed the obstacle."  State v. Newton, 291 Or. 788, 796 (1981).  This "institutional momentum" continued to build with the inclusion of the Uniform Chemical Tests for Intoxication Act as § 6-205.1 of the 1962 Uniform Vehicle Code, which encouraged additional States' enactment of implied consent provisions,[9] and ultimately

---

[9] Some other State Legislatures, including those of Idaho, Kansas, and Utah, enacted their own implied consent statutes after the New York model even prior to the inception of the Uniform Chemical Tests for Intoxication Act in 1957.  See Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Annual Conference, at 218 (1957).  Nebraska, North Dakota, South Dakota, Vermont, and Minnesota joined their ranks by the time implied consent appeared as § 6-205.1 of the Uniform Vehicle Code, in 1962. National Committee on Uniform Traffic Laws and Ordinances, Recent Developments in Chemical Test and Implied Consent Laws,

shaped Federal standards.  See, e.g., Report of the Legislative

Research Council Relative to Massachusetts Implementation of the

National Highway Safety Act of 1966 (Jan. 30, 1968), 1968 Senate

Doc. No. 980, at 48 (Massachusetts Implementation of the

National Highway Safety Act) (standard promulgated under Federal

Highway Act of 1966 and requiring implied consent provision was

"based on provisions of the Uniform Vehicle Code").

Notably, Massachusetts lagged far behind most other States

in its initial embrace of blood alcohol testing as evidence of a

driver's level of intoxication,[10] and trailed many others in its

_____

at 7 (Apr. 24, 1963).  Before year end of 1963, Virginia, North
Carolina, Minnesota, and Connecticut all followed suit.  See
Comment, Implied Consent to a Chemical Test for Intoxication:
Doubts about Section 6-205 of the Uniform Vehicle Code, 31 U.
Chicago L. Rev. 603, 604 & n.11 (1964).  Throughout this period,
State courts consistently rejected challenges to the
constitutionality of these statutes.  Id. at 605 & n.13 (citing
cases and early exception of Schutt v. Macduff, 205 Misc. 43, 46
[N.Y. Sup. Ct. 1954], prompting 1954 amendment of New York
model, which withstood subsequent challenges once altered).

[10] As of 1952, the only other States, apart from
Massachusetts, that had not yet recognized chemical testing to
determine operator sobriety were Arkansas, Louisiana, Georgia,
Kentucky, and Wyoming.  See Brooks, Chemical Tests for Driving
Under the Influence, 37 Mass. L.Q. 10, 17 (1952).  Nearly
another decade would pass until the Commonwealth amended G. L.
c. 90, § 24, to add subsection (e), setting a blood alcohol
content limit and accompanying presumption of "under the
influence," and establishing the admissibility of breath or
blood test results as evidence thereof.  St. 1961, c. 340.  In
1952, the Legislature apparently remained wary as to the
accuracy of the proposed scale correlating blood alcohol content
with extent of intoxication, and the accuracy of tests to
measure blood alcohol content.  See Brooks, supra.

later adoption of implied consent provisions.[11]  There can be little doubt as to why the bill that finally succeeded in making implied consent Commonwealth law was the one Governor John Volpe dispatched to the Legislature in March of 1967, see 1967 House J. 926, 928:  Massachusetts stood to lose the opportunity to access up to $7 million in new Federal highway funding along with ten percent of its present Federal highway aid, unless it complied with standards promulgated by the Secretary of Transportation under the Federal Highway Act of 1966.  See Pub. L. No. 89-564, Title I, § 101, inserting 23 U.S.C. §§ 401-404, 80 Stat. 731 (Sept. 9, 1966).  By the time the Supreme Court decided Schmerber, 384 U.S. 757, in June of 1966, the Federal legislative process that would culminate with President Lyndon Johnson signing the Federal Highway Act in September was already well under way, negating any suggestion that it was reactive to the Court's decision.

_____

[11] This was despite Governor John Volpe's efforts to implement license suspension measures to "correct" the evident "weakness" of the 1961 amendment providing for testing yet allowing "[d]rinking drivers . . . to refuse with impunity to take [them]."  1966 House Doc. No. 3131, at 7.  The Legislature consigned the Governor's first such attempt, 1962 Senate Doc. No. 764, and many related, subsequent bills to languish in committee "study" over the next five years.  See, e.g., 1963 House Doc. No. 2476; 1964 House Doc. No. 1125; 1964 House Doc. No. 1319; 1965 House Doc. No. 1127; 1965 House Doc. No. 1729; 1965 Senate Doc. No. 839.

The Secretary of Transportation included a requirement for implied consent authority as part of Highway Safety Program Standard No. Eight, "Alcohol in Relation to Highway Safety," despite the Schmerber Court's recognition that where police obtained a warrant or satisfied the exigent circumstances exception to the warrant rule, the United States Constitution did not prevent compelled blood tests, so long as performed in a reasonable manner.[12]  See Massachusetts Implementation of the National Highway Safety Act, supra at 69; Bruns, 58 Tex. L. Rev. at 943-944.  Of course, absent refusal, the implied consent approach still provided a more efficient means of collecting evidence than compelled testing, but there could no longer be

---

[12] In Schmerber, the Court reaffirmed its holding in Breithaupt (which predated the Court's extension of the Fourth Amendment exclusionary rule to bind the States) that a blood alcohol content test performed on an unconscious driver upon warrantless police request was constitutional, and its results were admissible at trial for OUI.  Notably, the Schmerber Court emphasized that, in that case, "the test was performed in a reasonable manner.  Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices."  Schmerber, 384 U.S. at 771.  The ruling expressly did not extend to any test "made by other than medical personnel or in other than a medical environment," which "might be to invite an unjustified element of personal risk of infection and pain."  Id. at 772.  Moreover, the Schmerber Court explicitly recognized that "[i]t would be a different case if the police initiated . . . violence, . . . or responded to resistance with inappropriate force," and further acknowledged "[t]he integrity of an individual's person [as] a cherished value of our society."  Id. at 760 n.4, 772.

any doubt that consent was unnecessary for a blood test to pass constitutional muster.

If the absence of blood testing from the implied consent provisions the Legislature enacted in 1967 indicates any continuing reservations about compelled testing, those reservations had disappeared by 1980, when the Legislature amended subsection (f) (1) such that refusing to consent to a blood test carried the same remedial license suspension consequences as refusing a breathalyzer test, enhancing the arrestee's incentives to submit to testing. See Memorandum from Secretary of Public Safety to Governor's Assistant Legislative Secretary regarding House Bill No. 2046 (June 27, 1980) (on file at the Massachusetts Archives). The 1980 amendment was enacted[13] in response to an emergency physicians' group report noting the typical absence of breath test equipment at hospitals, a lack of sanction for refusing a blood test, and no routine practice of testing blood alcohol content for medical purposes, which meant that injured drivers taken from a crash site to the hospital often were not tested. Id.

_____

[13] The 1980 amendment, like many other amendments to the G. L. c. 90, § 24, scheme, was implemented with an emergency executive preamble, proclaiming its immediate effect in the public's interest "in order that the tests and analyses provided for may be used in determining the operation of motor vehicles by persons under the influence of intoxicating liquor." Letter from the Governor to the Secretary of the Commonwealth (July 2, 1980).

Subsequent amendments to G. L. c. 90, § 24, further enhanced incentives to submit to blood alcohol content tests, some specifically aiming to deter repeat offenders' refusal to submit to testing as a strategy to reduce the likelihood of conviction.  For example, a 1990 Senate committee report suggested, based upon "increasing evidence . . . [of] the importance that these [blood alcohol content] tests play in obtaining a drunk driving conviction, [that] the state should make every effort to have test results from every person arrested for drunk driving."  Report of the Senate Committee on Post Audit and Oversight Relative to Controlling the Drunk Driver:  The 1980s in Review, at 30 (Dec. 26, 1990), 1990 Senate Doc. No. 1900.  That report also recommended increasing the license suspension period for refusing to take a breath or blood test to be twice as strong as the sanction for taking the test and failing it, as well as increasing penalties for subsequent offenders' refusals.[14]  See Letter from the Governor to the

---

[14] The affidavit submitted with the search warrant application in this case reported that a background check of the defendant revealed three prior arraignments on OUI charges, and one prior conviction.  His registry of motor vehicles history revealed multiple prior license suspensions for refusal to consent to testing.  If the conviction of OUI causing serious bodily injury were upheld, the defendant would face a ten-year license suspension in the event that he refused a blood alcohol test upon any subsequent arrest for OUI.  See G. L. c. 90, § 24 (1) (f) (1) (penalty for refusal after having been convicted of violation of § 24L).

Senate and House (May 27, 2005), 2005 House Doc. No. 4099 (transmitting draft legislation, later enacted as St. 2005, c. 122, and expressly stating intent to "increase the [license] suspension period for people who refuse the breathalyzer or field sobriety tests . . . to create an increased incentive to submit to such tests as required by law").

The court raises a concern over of the dangers of blood draws, ante at    , highlighting language from the subsection regarding the lack of implied consent for hemophiliacs and diabetics. See G. L. c. 90, § 24 (1) (f) (1). However, the statute anticipates such dangers by requiring that these blood tests be performed by medical professionals at a medical facility. Id. The police here provided the defendant with multiple opportunities to comply with the warrant, and officers handcuffed the defendant to the stretcher in an effort to prevent the type of harm presented by "sharps" that the majority raises. Ante at    . At the time of the blood draw, the nurse testified, the defendant cooperated with the procedure, and the nurse exercised care by following all standard procedures of the hospital, including the nurse's use of a vacuum system to reduce the "sharps" danger to the nurse. Medical professionals typically identify a condition like hemophilia or diabetes in taking a patient's medical history, not to mention that persons

afflicted by those conditions often wear or carry specific identification.

The court points out that "actual consent for blood draws is also a safety measure." Ante at    . And it is. But for every hemophiliac, diabetic, or person on anticoagulant medication who is arrested for OUI, or for every medical worker who is injured by a sharp needle when blood is drawn -- contingencies that as a matter of course are addressed by the medical profession without incident -- immeasurably more danger results from permitting repeat OUI offenders to get behind the wheel. If the concern is "safety measures," the best response is to provide jurors with the best evidence of sobriety, or lack thereof, so as to help deter repeat offenders from getting behind the wheel of a motor vehicle while intoxicated. By not precluding the use of warrants to collect blood alcohol content evidence from a defendant's blood, and consistently legislating to encourage arrestees to submit to blood alcohol content tests, I believe that this course is the one our Legislature intended to follow.

Far from intending to grant defendants an absolute statutory right to deprive juries of the most probative evidence of driver impairment, the Legislature intended the provisions of subsections (e) and (f) (1) to facilitate, within the confines of the Declaration of Rights and the United States Constitution,

the efficient collection of reliable evidence by encouraging defendants to consent to testing, and to facilitate justice by providing the trier of fact with the most probative evidence of guilt or innocence.  Common sense and the canons of statutory construction clearly demonstrate that the Legislature did not intend to prohibit the admissibility of blood alcohol content evidence obtained pursuant to a search warrant based upon probable cause.[15]

3.  Persuasive constructions in other jurisdictions.  Other States have enacted implied consent laws that include a directive that "no such test . . . shall be made," following a defendant's refusal, while remaining silent regarding tests performed pursuant to a warrant.  Appellate courts in those States have construed these cognate provisions to encompass only tests pursuant to warrantless officer requests.[16]  Notably, and

_____

[15] Proscribing the use of a warrant to obtain evidence of driver impairment "would be to place allegedly drunken drivers in an exalted class of criminal defendants, protected by the law from every means of obtaining the most important evidence against them."  Pena v. State, 684 P.2d 864, 869 (Alaska 1984) (Compton, J., dissenting).

[16] I would join with those courts construing the "no such test" language so as not to exclude test results obtained pursuant to a valid warrant.  See, e.g., Britton v. State, 631 So. 2d 1073, 1076-1077 (Ala. Crim. App. 1993); Metzner v. State, 2015 Ark. 222, at 10; State v. Smith, 134 S.W.3d 35, 40 (Mo. Ct. App. 2003); Beeman v. State, 86 S.W.3d 613, 616-617 (Tex. Crim. App. 2002); State v. Stone, 229 W. Va. 271, 284 (2012).  See also Brown v. State, 774 N.E.2d 1001, 1007 (Ind. Ct. App. 2002)

without coincidence, State appellate decisions interpreting similar "no test" language to prohibit police from obtaining blood alcohol content evidence under a warrant, including those cited ante at    , were subsequently superseded by statutory amendment:  These Legislatures' responsive amendments each carry a "for the avoidance of doubt" connotation suggesting that the court misconstrued the statute as initially written.  See State v. Evans, 378 P.3d 413, 416 (Alaska Ct. App. 2016) (quoting revised statute:  "Nothing in this section shall be construed to restrict searches or seizures under a warrant issued by a judicial officer, in addition to a test permitted under this section"); McAllister v. State, 754 S.E.2d 376, 379 (Ga. App. Ct. 2014) (noting similar legislative amendment); R.I. Gen. Laws § 31-27-2.9(a), inserted by R.I. St. 2009, c. 210, § 2 ("Notwithstanding any provision of § 31-27-2.1, . . . a chemical test may be administered without the consent of that individual provided that the peace officer first obtains a search warrant authorizing administration of the chemical test").  See also State v. Stanley, 217 Ariz. 253, 257 (Ct. App. 2007) ("the legislature's amendments [including 'or pursuant to a search

_____

(noting statutory silence on question and concluding that "provisions of the implied consent law do not act either individually or collectively to prevent a law enforcement officer from obtaining a blood sample pursuant to a search warrant").

warrant'] were 'obviously . . . a response' to <u>Collins</u> v. <u>Superior Court</u>, [158 Ariz. 145 (1988)]"); <u>State</u> v. <u>Garnenez</u>, 2015-NMCA-022, 344 P.3d 1054, 1058 (N.M. Ct. App. 2014), quoting N.M. Stat. Ann. § 66-8-111(A) (noting amendment that added "except when a municipal judge, magistrate or district judge issues a search warrant" after "none shall be administered").

4. <u>Conclusion</u>. It is now well established that the alcohol content of an individual's blood is not testimonial evidence, and its admission in evidence does not implicate self-incrimination concerns. See <u>Schmerber</u>, 384 U.S. at 764; <u>Brennan</u>, 386 Mass. at 783. As the court acknowledges, obtaining or admitting such evidence, subject to a valid warrant, does not otherwise violate the United States Constitution or the Declaration of Rights. See <u>ante</u> at   . The admissibility, consent, and refusal provisions of subsections (<u>e</u>) and (<u>f</u>) (1) pose no roadblock either to the issuance and execution of a valid warrant to collect evidence of a defendant's blood alcohol content, or to admitting that probative evidence of impairment at trial. The Legislature assuredly did not enact the implied consent statute to render inadmissible the result of a blood alcohol content obtained pursuant to a search warrant issued by a neutral and detached magistrate upon an informed finding of probable cause, and subject to the requirement of reasonable execution.

And why would they?  The Legislature has exercised its police power to regulate the use of motor vehicles and promote public safety for more than a century:  "No one has a right to use the streets . . . as he chooses, without regard to the safety of other persons who are rightly there."  Commonwealth v. Kingsbury, 199 Mass. 542, 545 (1908).  When a person operates a motor vehicle while under the influence of intoxicating liquor, that person endangers the lives and safety of every other driver and passenger on the road.  There is no reason why prosecutors should have to try OUI charges with both arms tied behind their backs, especially when the jury do not and cannot know the prosecutor's arms are thus bound by law.[17]  When "jurors find facts, not from a fair consideration of the evidence, but rather based upon bewilderment as to why no evidence of a breathalyzer

---

[17] Where blood alcohol content evidence is absent, jury inquiries like, "Why would a [b]reathalyzer test be or not be administered?" are common.  Commonwealth v. Gibson, 82 Mass. App. Ct. 834, 835-836 (2012).  See Commonwealth v. Wolfe, 478 Mass. 142, 152 (2017) (Lowy, J., dissenting) (jury at defendant's first trial, which resulted in mistrial, asked, "Are we allowed to ask:  'Why there are no tests?' [e.g.,] Breathalyzer or blood test?");  Commonwealth v. Palka, 97 Mass. App. Ct. 1111 (2020) (trial judge gave instruction pursuant to Commonwealth v. Downs, 53 Mass. App. Ct. 195, 197-201 [2001], after explaining, "Every time I don't give it, they ask it as a question");  Commonwealth v. Klegraefe, 97 Mass. App. Ct. 1106 (2020) (jury asked whether breathalyzer test was performed);  Commonwealth v. Miller, 97 Mass. App. Ct. 1104 (2020) (jury asked:  "Did he have a breath test?  Was it offered or refused?").  I predict that the court's interpretation of the implied consent statute to preclude an alternative legal means to obtain that evidence will only exacerbate this problem.

test was introduced," Commonwealth v. Wolfe, 478 Mass. 142, 151 (2017) (Lowy, J., dissenting), and without explanation as to why they lack such evidence, the trial's truth-seeking function is impaired, and the rate of acquittals and recidivism proliferates.

When it comes to evidence that the defendant refused to submit to testing under the implied consent law, the inadmissibility of that evidence is a price I embrace as the cost of our precious liberty and the sanctity of the right against self-incrimination. But when the Commonwealth has obtained evidence of a defendant's blood alcohol content by constitutional means, pursuant to a validly issued and reasonably executed search warrant, there is no reason to exclude that evidence, especially in light of the Legislature's clear intent to promote its collection and use as the most efficient means of enforcing the laws and deterring substance-impaired driving. Contorting subsections (e) and (f) (1) otherwise unnecessarily endangers human life and provides unwarranted protection to dangerous repeat offenders. I would uphold the trial judge's admission of the blood test results in evidence at the defendant's trial and affirm the defendant's conviction under G. L. c. 90, § 24L (2), for OUI causing serious bodily injury.